967 A.2d 790

**Darryl KING**

v.

**STATE of Maryland.**

**No. 43, Sept. Term, 2008.**

Court of Appeals of Maryland.

March 18, 2009.

684

Gary E. Bair, Bennett & Bair, LLC, Greenbelt, for Petitioner.

Carrie J. Williams, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

Opinion by HARRELL, J.

## I.

The circumstances giving rise to this criminal prosecution occurred on 29 July 2004, between 2:00 and 3:00 in the morning. The victim, Kevin Phillips, was shot 12 times, distributed over his stomach, arms, and buttocks. Emergency responders found him, alive, in the parking lot of an apartment complex, rendered aid at the scene, and transported him to the Prince George's County Hospital Center. There, Phillips, who was semi-conscious at the time, told a detective that "Dubbies" shot him; however, he did not provide then any additional details about the shooting. He survived, but required stomach surgery and remained in the hospital for seven days. Phillips did not provide a further oral or written statement to police until approximately eight months later, on 24 March 2005. At that time, he identified, from a photo array, Darryl King as "Dubbies." King was arrested and indicted in the Circuit Court for Prince George's County for attempted murder and related charges. He pleaded not guilty to all charges.

King's trial defense stratagem was to cast doubt on the version of events recounted by Phillips and Phillips's fiancée, Terri Lagarde, the State's key witnesses. King's apparent conception of the relevant events was that, at the time Phillips was shot, Phillips was with a drug dealer named "Cat" and that Phillips was shot in a volley of gunfire which erupted during a dispute that he and Cat were having with others on

the parking lot.[1] Phillips and Lagarde, as the defense theory continued, implicated King in the shooting because they were close with Cat and Cat was angry with King over King's association with another man, Curtis, who Cat believed stole a large quantity of marijuana from him. King's theory unfolded at trial as follows.

### The State's Case on Direct Examination

On direct examination by the prosecutor, Phillips testified that he was shot repeatedly by three men, including King, who he knew only as "Dubbies" at the time of the shooting. He did not know why King shot him. According to Phillips, he had pulled into the parking lot of his apartment complex, exited his car, and called his fiancée, Terri Lagarde, with his cell phone. While speaking with her, a black Ford Explorer, with its lights off, drove onto the parking lot and stopped. Of the five men in the vehicle, three exited and approached him. He recognized one of the on-coming men as "Dubbies," a regular at the Crossroads nightclub, a haunt which Phillips also frequented. Dubbies kept his hands behind his back while announcing, "I come in peace." Phillips, however, saw that Dubbies concealed a chrome .45 caliber handgun and, skeptical of Dubbies's proclaimed benign intent, tried to run away. At that point, Dubbies and the two other gunmen brandished handguns and opened fire on Phillips. Phillips overheard one of the shooters complain, "he [Phillips] can't die." According to Phillips, there was no one else on the parking lot during the shooting.

Phillips also explained that he had not recounted the forego-ing narrative to a detective until March 2005, nearly eight months after the shooting. He did not remember the detec-tive's name, only his face.

---

1. It is not entirely clear whether King was advancing a self-defense argument or, simply, that he was not present on the parking lot. Suffice it to say, King's position was that whoever shot Phillips did so during a shoot-out in which Phillips was a participant.

Lagarde, Phillips's fiancée, also testified for the State, apparently in an effort to bolster Phillips's account of what happened on the night he was shot. According to her, she heard the gunshots while she was on the phone with Phillips. She heard Phillips say "what, what" and something about a "black truck"; then, his phone "clicked off." Lagarde said she waited for a few minutes to see if he would call her back, but, when he did not, she went looking for him. Knowing the general vicinity where he was when he called her, Lagarde drove until she saw ambulance lights. As she approached, she saw paramedics treating Phillips. According to Lagarde, Phillips spoke to her, saying, "ma, ma, they done shot me. For no reason, they just shot me. They just shot me for nothing." The paramedics took him to the hospital while Lagarde waited at the scene to speak with detectives. After she relayed to them what she heard before her phone call with Phillips ended, she gave them her cell phone number and drove to the hospital. Lagarde took Phillips home with her after his discharge from the hospital; however, they moved out of her apartment within eight hours of arriving there, choosing to relocate to Washington, D.C., out of fear for Phillips's safety. She did not provide the police with their new address.

The State next called Detective Robert Holland, the officer in charge of investigating the shooting. He testified that he arrived at the crime scene shortly after emergency responders took Phillips to the hospital. Detective Holland explained that two complete bullets, two bullet fragments, and seven shell casings were found on the parking lot. All of the projectiles were fired from nine millimeter handguns. The State did not introduce any additional forensic evidence.

According to Detective Holland, he met with Lagarde on the same night as the shooting. He spoke with Phillips the following evening at approximately 10:00 p.m. At that time, Phillips could not provide much insight into the circumstances of the shooting, Detective Holland asserted, because Phillips "was still undergoing medical treatment"; however, he was alert and coherent enough to identify "Dubbies" as an assailant. The nickname eventually led the detective to consider

King as a suspect. He prepared a photo array for Phillips's review, which included a photograph of King obtained from the Motor Vehicle Administration, to determine whether King was the "Dubbies" to whom Phillips referred.

Detective Holland described, through the following colloquy, his efforts to set up a meeting with Phillips in the months following Phillips's discharge from the hospital:

Q ... And once you got the photograph and you prepared a photo array what, if anything, did you do?

A I made attempts to contact Mr. Phillips.

Q And were you able to contact him?

A I was. After a few times, we finally had a meeting in March.

Q And when you say you were trying to contact him, when you say that, what exactly were you doing?

A At that point I had a cell phone number for him. I was trying to contact his cell phone which was the only point of contact I had for him. I left a couple of messages. I tried to call Terri, left a few messages with her, and we were back and forth leaving messages for one another for several weeks in-between.

After Detective Holland testified, the State rested.

### Defense Cross–Examination

King's defense counsel asked Phillips why he waited eight months before contacting police, to which Phillips responded that the officer investigating the shooting "wasn't speaking to me. [He] was speaking to my girl [Lagarde]." Phillips asserted that he could not meet with police until March 2005 because he could not walk. He also revealed that Lagarde went with him when he finally gave his statement to the police. In his words, "she was just trying to calm me down [and] at the same time trying to give clarity to the police officer." In hindsight, he claimed that Lagarde was there mainly to calm him down.

Phillips acknowledged that he and King knew each other socially and that Lagarde's son used to baby-sit King's chil-

dren.   Furthermore, he and Lagarde had socialized with King and King's girlfriend "three [or] four times."   Phillips was resolute, however, that he had not seen King on the day of the shooting and that he did not tell King where he would be that evening or early in the morning when the shooting occurred. Nonetheless, he claimed to know that King and his cohorts had just come from a club before shooting him.   Furthermore, although he testified initially that he was attacked on the parking lot of his apartment complex, on cross-examination, the following exchange occurred:

Q   Do you live ... where his happened?

A No, I don't live there.

Q   You don't live over there.   Is that a place you go to often?

A Yes. We hang—yeah.   That's our place that we meet up, hang out, play games, smoke.

Q   Okay. And who is it that [sic] you go there to do that with?

A The guy who owned the apartment, his name is Hector.

Defense counsel impeached Phillips with a November 2002 felony conviction for possession with intent to distribute cocaine.[2]   Additionally, Phillips acknowledged that, before he was shot, he was aware of a falling-out between Cat and King, then known to him as "Dubbies";   however, he said he was in New York when Cat and King began to feud.   Defense counsel questioned Phillips on his association with Cat, yielding the following colloquy:

---

**2.**   Section 5–602 of the Criminal Law Article provides:

Except as otherwise provided in this title, a person may not:
(1) manufacture, distribute, or dispense a controlled dangerous substance; or
(2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all the circumstances an intent to manufacture, distribute, or dispense a controlled dangerous substance.

Maryland Code (2002 Repl.Vol.), Criminal Law Article, § 5–602.   A person convicted of possession with intent to distribute cocaine is guilty of a felony and subject to a term of imprisonment of up to 20 years.   *Id.* § 5–608(a).

Q   Isn't it true that your supplier, Cat, your boss, was with you right there [at the time of the shooting] and had a gun?

. . . .

A I have no boss.

. . . .

A And there was nobody outside with me with any sort of weapon or any sort of—to harm anybody.

Q   Sir, do you remember a week before this shooting when you approached my client and told him he should leave town?

. . . .

A Nope.

. . . .

Q   Do you know a person named Cat?

A Yes.

. . . .

Q   All right what is your relationship with Cat?

A Friends.

Q   Do you have any business relationship with Cat?

A Nope.

Defense counsel sought to question Phillips further, asking questions that, inferentially, would have elicited responses that Cat was the leader of a drug ring and that Phillips was in Cat's employ.   Specifically, King's counsel proffered:

[M]y client . . . had a personal face-to-face conversation with [Kevin Phillips] one week before the incident in question where this witness, Kevin Phillips, told my client, Darryl King, that he should leave town, that there was a meeting that Cat called.   Cat is the leader of this drug ring in this area of which this witness, Kevin Phillips, is a very active member along with his girlfriend who's going to testify for the State who was convicted along with him in the same drug case he was convicted of.

The trial judge, however, refused, upon the State's objection, to permit further cross-examination regarding Cat be-

cause Phillips denied knowledge of any meetings with Cat or King and because the only basis for the proposed line of questioning was the foregoing proffer.[3] King offered no additional evidentiary basis for why Phillips may have been motivated to lie. The record is devoid of admissible evidence tending to identify Cat as a drug dealer or suggesting that King and Phillips ever discussed the need for King to leave town.

King continued sowing seeds of doubt as to Phillips's version of events during cross-examination of Lagarde, who confirmed that she knew King (as "Dubbies") and that she and Phillips occasionally socialized with King and his girlfriend when they saw them at nightclubs. The genesis of the flagship issue in the case before us was defense counsel's attempt to impeach Lagarde with her 2002 felony conviction for possession with intent to distribute marijuana.[4] The trial judge denied defense counsel's request to confront Lagarde with this conviction, concluding that, under Maryland Rule 5–609,[5] the danger of unfair prejudice outweighed its probative value. In this regard, the following exchange occurred:

[DEFENSE]: I believe that this witness is not being truthful. She has—

---

**3.** In his appeal to the Court of Special Appeals, King contended that the trial court violated his Sixth Amendment right to confrontation by foreclosing further cross-examination of Phillips about Cat. The intermediate appellate court disagreed, affirming the trial court. King does not seek our review of this contention.

**4.** See *supra* note 3. A person convicted of possession with intent to distribute marijuana is guilty of a felony and is subject to a prison term of up to five years. Maryland Code (2002 Repl. Vol.), Criminal Law Article, § 5–607(a).

**5.** Rule 5–609 provides, in relevant part:
(a) **Generally.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or objecting party.

THE COURT: That's your belief.

[DEFENSE]: That's correct. She has a prior conviction in the Circuit Court for Prince George's County for possession with intent to distribute marijuana in 2002 where she was represented by counsel, entered a guilty plea. She was sentenced. It is in her past and it's an enrolled conviction. I would like to impeach her with that prior conviction.

THE COURT: What do you say?

[STATE]: I would object. She hasn't even said anything that appears to be untruthful here.

THE COURT: She hasn't said anything at all other than she heard of him, talked to him, and that she went to a location and she saw him.

[STATE]: That's all she said.

THE COURT: If you want to impeach her, I would say the prejudice is not outweighed by the probative value.

. . . .

THE COURT: And it doesn't have to do with that case or the type of conviction. It has to do with the fact that insofar as impeaching her, the prejudice of that outweighs any probative value of impeaching her.

[DEFENSE]: I would like to put something on the record.

. . . .

[DEFENSE]: I want to point out to the Court that, you know, a witness can perhaps to the Court who does not have the luxury of gaining other information and, obviously, doesn't have a background with the case can appear to be telling the truth. But there is—this witness has given no statement to the police. I just learned that she was going to be a witness.

THE COURT: Well, she hasn't testified to anything.

[DEFENSE]: To my judgment, she has. To my judgment, she is completely lying about the reality.

THE COURT: Do you have a witness who will testify to that?

[DEFENSE]: Well, I can put my client on in camera to testify as to what this witness is lying about. We have not made a decision as to testifying in the trial ultimately, but I'll be happy for a brief in camera hearing to proffer as follows: That this witness was told by Cat to tell ... the police to implicate Darryl [King] because she works for Cat and Cat wanted to kill [King] and Cat just wanted to get [King] anyway and personally told this witness to have Kevin Phillips say it was [King] and that Cat was actually on the scene ... where this happened....

. . . .

[DEFENSE]: I also have some additional argument and that is this. The case in which she was convicted involves six thousand grams of marijuana and the case that we all are aware of, [State v. Woodland, 337 Md. 519, 654 A.2d 1314 (1995) ], says a narcotics trafficker lives a life of secrecy and dissembling in the course of that activity.

THE COURT: I've read the case ... I say with reference to this witness, the prejudice of using that outweighs the probative value.

[DEFENSE]: I would suggest that it's the prejudice to the accused is where the—

THE COURT: Prejudice to the witness.

[DEFENSE]: ... I do think, however, the prejudice to the accused is a factor and it is ordinarily probative and in the zone of convictions that are relevant for credibility purposes. That's what the cases ultimately conclude. And here we have a witness who, I believe, is lying and I'm not allowed to attack her credibility with this.

THE COURT: She hasn't said anything at all about the facts of this case. If she's saying something about some collateral issue, you know, that's something that you've just raised in your cross-examination. She wasn't asked anything about the collateral matter. I'm denying your request.

King elected not to present any evidence and moved for a judgment of acquittal, which the court denied. The jury

convicted him of attempted first degree murder, conspiracy to commit first degree murder, first degree assault, second degree assault, reckless endangerment, use of a handgun in the commission of a crime of violence, and transporting a handgun. The court sentenced King to life imprisonment for attempted first degree murder, with a life sentence for conspiracy to commit first degree murder to be served concurrently. The court also imposed a consecutive sentence of 20 years for use of a handgun in the commission of a crime of violence. The sentences for King's other convictions merged.

King noted a timely appeal to the Court of Special Appeals, which, in an unreported opinion, affirmed. He filed with this Court a Petition for a Writ of Certiorari, which we granted. *King v. State*, 405 Md. 290, 950 A.2d 828 (2008). The petition posed two questions:

I.  Did the Circuit Court and the Court of Special Appeals apply an erroneous legal standard in determining that a prior felony drug conviction was not admissible to impeach a prosecution witness?

II.  Did the Court of Special Appeals err in holding that the prosecutor, in her closing argument, did not reference King's failure to testify in his own defense and, therefore, did not violate his Fifth Amendment right to be free from self-incrimination? [6]

For the reasons that follow, we reverse the judgment of the Court of Special Appeals. Because we shall hold that King is entitled to a new trial based on the Circuit Court's ruling denying his request to impeach Lagarde with her prior conviction, we shall not consider the constitutional argument posed by his second question.[7]

---

**6.** We reworded King's second question. The question, as originally worded, asked:

Did the Court of Special Appeals improperly rule that the prosecutor's blatant reference to Petitioner's failure to testify at trial did not constitute reversible error?

**7.** During her closing argument, the prosecutor said:

## II.

## Standard of Review

Appellate review of a trial court's application of the balancing test of Rule 5–609 is deferential. *Jackson v. State,* 340 Md. 705, 719, 668 A.2d 8, 15 (1995). " 'The conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge[,] and an appellate court should in no case interfere with that judgment unless there has been an abuse of discretion by the trial judge of a character likely to have injured the complaining party.' " *Kelly v. State,* 392 Md. 511, 531, 898 A.2d 419, 430 (2006) (quoting *Cooley v. State,* 385 Md. 165, 176, 867 A.2d 1065, 1071 (2005)). We review these types of evidentiary rulings pursuant to the abuse of discretion standard, reversing only when the court " 'exercise[d] discretion in an arbitrary or capricious manner or . . . act[ed] beyond the letter or reason of the law.' " *Id.* at 530–31, 898 A.2d at 430 (quoting *Cooley,* 385 Md. at 175–76, 867 A.2d at 1071). Our determination of whether a trial court abused its discretion "usually depends on the particular facts of the case [and] the context in which the discretion was exercised." *Myer v. State,* 403 Md. 463, 486, 943 A.2d 615, 628 (2008).

You heard testimony from the victim that repeatedly he was the only person out there. It's 3:00 in the morning. There's some testimony it was between 2, 2:30, 3:00. This happened between the two a.m. hour and the three a.m. hour. He says, I was the only person out there. I think he would know if there were other people outside. No one else was out there but him. And besides that, he is the only person that we have here today saying that they were shot.
In *Smith v. State,* this Court held that a defendant's Fifth Amendment right to be free from self-incrimination is violated when the prosecutor makes a remark that is " 'susceptible of the inference by the jury that they [are] to consider the silence of the traverser in the face of the accusation of the prosecuting witness as an indication of his guilt.' " 367 Md. 348, 354, 787 A.2d 152, 155 (2001) (italics omitted) (quoting *Smith v. State,* 169 Md. 474, 476, 182 A. 287, 288 (1936)). King suggests the jury might have interpreted the prosecutor's words as commentary on his failure to testify, thus entitling him to a new trial; however, we decline to consider his argument "[i]n light of [our] policy against deciding constitutional issues unnecessarily." *See, e.g. VNA Hospice of Md. v. Dep't of Health & Mental Hygiene,* 406 Md. 584, 605, 961 A.2d 557, 569 (2008).

One of the more helpful pronouncements on the contours of the abuse of discretion standard comes from Judge Alan M. Wilner's opinion in *North v. North,* 102 Md.App. 1, 648 A.2d 1025 (1994). Now retired from this Court, but then the Chief Judge of the Court of Special Appeals, Judge Wilner explained:

"Abuse of discretion" is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. It has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reason and works an injustice."

There is a certain commonality in all these definitions, to the extent that they express the notion that a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of "untenable grounds," "violative of fact and logic," and "against the logic and effect of facts and inferences before the court."

*North,* 102 Md.App. at 13–14, 648 A.2d at 1031–32 (alterations in original) (internal citations omitted).

■ Even when our review of a record leads us to determine that the trial court abused its discretion, we yet may affirm the trial court's decision if we are " 'able to conclude, beyond a reasonable doubt, that the error in no way influenced the verdict.' " *State v. Westpoint,* 404 Md. 455, 487, 947 A.2d 519, 538 (2008) (quoting *Newman v. State,* 384 Md. 285, 312, 863 A.2d 321, 337 (2004)).

### III.

### Analysis

■ When interpreting the Maryland Rules, we look to the ordinary rules of statutory construction. *Hurst v. State,* 400 Md. 397, 417, 929 A.2d 157, 168 (2007). If the language of a rule is clear and unambiguous, it will be applied in a common-sense manner. *Id.*

Rule 5–609 provides, in relevant part:

(a) **Generally.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or objecting party.

(b) **Time limit.** Evidence of a conviction is not admissible under this Rule if a period of more than 15 years has elapsed since the date of the conviction.

*See also Westpoint,* 404 Md. at 473, 947 A.2d at 530.

This Court limned the following three-part test for determining whether a witness may be impeached with evidence of a prior conviction under Rule 5–609:

First, subsection (a) sets forth the "eligible universe" for what convictions may be used to impeach a witness's credibility. This universe consists of two categories: (1) "infamous crimes" and (2) "other crimes relevant to the witness's

credibility." Infamous crimes include treason, common law felonies, and other crimes classified as *crimen falsi.* If a crime does not fall within one of the two categories, then it is inadmissible and the analysis ends. This threshold question of whether or not a crime bears upon credibility is a matter of law. If a crime falls within one of the two categories in the eligible universe, then the second step is for the proponent to establish that the conviction was not more than 15 years old, that it was not reversed on appeal, and that it was not the subject of a pardon or a pending appeal. Finally, in order to admit a prior conviction for impeachment purposes, the trial court must determine that the probative value of the prior conviction outweighs the danger of unfair prejudice to the witness or objecting party. This third step is clearly a matter of trial court discretion.

*Westpoint,* 404 Md. at 477–78, 947 A.2d at 532 (quoting *State v. Giddens,* 335 Md. 205, 213–14, 642 A.2d 870, 874–75 (1994)).[8]

The State concedes that Lagarde's 2002 conviction for possession with intent to distribute marijuana falls within the "eligible universe" of convictions that King potentially could use to impeach her credibility. Recently, in *Westpoint,* Judge Battaglia chronicled the cases of this Court discussing what kinds of convictions are admissible potentially for impeachment purposes. 404 Md. at 478–84, 947 A.2d at 533–37. Thus, we need not delve deeply again into this aspect of the rule. Suffice it to say that, in *State v. Woodland,* we held squarely that a conviction for possession with intent to distribute marijuana is relevant to a witness's credibility and, therefore, is admissible for impeachment purposes, subject to the other considerations found in Rule 5–609. 337 Md. 519, 524,

---

8. As Judge Battaglia explained in *Westpoint,* this three-part test was articulated in *Giddens,* a case involving the interpretation and application of the predecessor of Rule 5–609, Rule 1–502. *Westpoint,* 404 Md. at 478, 947 A.2d at 533 (discussing *Giddens,* 335 Md. at 213–14, 642 A.2d at 874). The Court rescinded Rule 1–502, effective 1 July 1994, replacing it with Rule 5–609, which is "nearly identical" to the former rule. *Id.* (quoting *State v. Woodland,* 337 Md. 519, 521, 654 A.2d 1314, 1315 n. 1 (1995)); *see also Jackson,* 340 Md. at 712–13, 668 A.2d at 12 (applying similar three-part test to Rule 5–609).

654 A.2d 1314, 1316 (1995). In the present case, Lagarde's 2002 conviction is less than 15 years old. It currently is not the subject of an appeal; nor has it been brought to our attention that Lagarde was pardoned. Therefore, the balancing of the conviction's probative value against the danger of unfair prejudice is engaged.

King argues that the trial court, in applying the balancing test, did not give sufficient regard to his stake in impeaching Lagarde's credibility and overemphasized the prejudice that would accrue to the State or Lagarde if her conviction was disclosed to the jury. The State, not surprisingly, rejoins that the trial judge acted within his discretion because Rule 5–609, by its plain language, does not require special attention to the interests of an accused in situations, such as this one, where the accused is neither the witness nor the objecting party. *See* Md. Rule 5–609 (directing court to balance probative value against "danger of unfair prejudice to the witness or objecting party"). The State contends that Lagarde's conviction did not have meaningful probative value because Lagarde did not identify King as one of the men who shot Phillips. The State also argues that allowing King to use Lagarde's conviction would have prejudiced unfairly the State by prompting jurors to infer that Lagarde currently is dealing drugs.

In *Jackson v. State*, we explained that the balancing test of Rule 5–609 " 'stems from the risk of prejudice.' " 340 Md. at 715, 668 A.2d at 13 (quoting *Ricketts v. State*, 291 Md. 701, 703, 436 A.2d 906, 907 (1981)). By directing trial courts to weigh probative value against the danger of unfair prejudice, Rule 5–609 attempts "to discriminate between the informative use of past convictions to test credibility, and the pretextual use of past convictions where the convictions are not probative of credibility but instead merely create a negative impression" of the witness. *Id.* at 716, 668 A.2d at 13. In *Jackson*, we identified five non-exhaustive considerations to guide trial courts in weighing the probative value of a prior conviction against the danger of unfair prejudice: (1) the impeachment value of the prior crime; (2) the time that has

elapsed since the conviction and the witness's history subsequent to the conviction; (3) the similarity between the prior crime and the conduct at issue in the instant case; (4) the importance of the witness's testimony; and (5) the centrality of the witness's credibility. *Id.* at 717, 668 A.2d at 14 (citing *United States v. Mahone*, 537 F.2d 922, 929 (7th Cir.1976)).[9] We also urged trial courts applying Rule 5–609 "to place [on the record] the specific circumstances and factors critical to the decision." *Id.*

In the present case, King advances two interrelated challenges to the trial court's application of the Rule 5–609 balancing test. First, he asserts that, under the circumstances, Lagarde's 2002 conviction would have been highly probative impeachment evidence because her testimony was integral to the State's case and her credibility was important to the jury's perception of her testimony. Second, King suggests that, as a general rule, there is significantly less potential for unfair prejudice where the witness to be impeached is not the defendant. This is so, King urges, because there is no danger of the jury using improperly the impeachment evidence as propensity evidence to convict the defendant. *See* Rule 5–404 (generally prohibiting evidence "for the purpose of proving action in conformity therewith"). We shall discuss each of his contentions in turn.

"Where credibility is the central issue, the probative value of the impeachment is great, and thus weighs heavily against the danger of *unfair* prejudice." *Jackson*, 340 Md. at 721, 668 A.2d at 16 (italics in original). In the context of the present record, evidence of Lagarde's 2002 felony conviction

---

**9.** In *Jackson*, the State sought to impeach the testifying defendant. Naturally, we discussed these five considerations in that context, referring to the "defendant's history," the "defendant's testimony," and the "defendant's credibility." 340 Md. at 717, 668 A.2d at 14. We see no reason why these five considerations should not apply here, where the defendant seeks to impeach a State's witness. Indeed, we observed, in *Jackson*, that they "should not be considered mechanically." We note, however, that the third consideration is probably less relevant where the witness is not the defendant because the impeachment evidence ordinarily could not be misused as propensity evidence.

could have been highly probative. The State's case hinged almost entirely on the jury believing Phillips's testimony, which Lagarde partially corroborated. While not certain, it is at least conceivable, based on what was adduced at trial, that the jury could have been unsure of Phillips's account, making the corroboration provided by Lagarde an important component to the State's successful prosecution. Indeed, the only forensic evidence presented by the State could be viewed as conflicting with Phillips's testimony; Detective Holland testified that all bullets, bullet fragments, and shell casings found at the scene of the shooting were from nine millimeter handguns, whereas Phillips recalled that King carried a .45 caliber handgun on the eventful night. Additionally, Phillips did not contact the police for eight months following his discharge from the hospital, and his testimony that police did not try to reach him during those months appears inconsistent with the testimony of Detective Holland, who stated that he called Phillips and "left a couple of messages." Moreover, Phillips knew King, at least by King's nickname, and expressed that he occasionally socialized with King at nightclubs. Irrespective of the questions about "Cat" foreclosed by the trial judge, Phillips nevertheless made clear that he was a friend of someone named "Cat" and Cat and King shared a mutual distaste for each other. Also, Phillips testified initially that he was shot on the parking lot of his apartment complex; however, he later said that the parking lot was part of the apartment complex where his friend, Hector, resided. He maintained that he did not see King on the date in question and did not tell King where he would be between 2:00 and 3:00 in the morning; however, he somehow knew that King and his cohorts came from a club to the shooting on the parking lot.

The twists and turns of Phillips's narrative do not connote untruthfulness necessarily, especially if a trier of fact chose to discount irregularities because of the physical and emotional strain on someone who survives such an attempt on his life; however, the relative lack of consistency in his account of the events of and surrounding the shooting, coupled with the impeachment evidence of his earlier conviction for possession

with intent to distribute cocaine, suggests that the partial corroboration provided by Lagarde's testimony was not an unimportant component of the State's case. Lagarde corroborated key facts, bolstering portions of Phillips's account of the incident that favored the State's case. She testified that she was on the phone with Phillips for three or four minutes before his phone "clicked off." She said that she heard gunshots over the phone; she heard Phillips say, "what, what" and something about a "black truck." She also testified that, when she arrived at the scene, Phillips said to her, "ma, ma, they done shot me. For no reason, they just shot me. They just shot me for nothing."

The State acknowledges that Lagarde's testimony was "helpful" to its case; however, because she did not identify King as the shooter, the State posits that her testimony was not so important that King should have been allowed to impeach her with evidence of her prior conviction. We do not subscribe to the State's characterization in this regard. The State's case required the members of the jury to decide whether they believed Phillips's narrative of events. Considering the somewhat confusing and conflicting aspects of his story, Lagarde's testimony to key facts, consistent with those portions of Phillips's account, was beyond "helpful"; it unquestionably made more probable Phillips's account of the shooting, favoring the prosecution. Therefore, Lagarde's testimony was important to the State, and the impeachment value of her conviction certainly would have been probative under the circumstances.

The probative value of Lagarde's conviction is enhanced by other facts concerning Lagarde. First, Lagarde did not call the police promptly after she heard the shots over Phillips's phone; instead, she waited a while and then went looking for him. Second, she also knew King and his girlfriend socially and even allowed her son to baby-sit their children. Third, although Phillips tried to back-peddle, he testified, on cross-examination, that Lagarde went with him to give a statement to police in March 2005 and helped him "give clarity to the officer." These facts tend to suggest a lack of solidity in

Lagarde's account, as well as Phillips's. When coupled with the fact that Phillips is her fiancé, and certainly not a stranger or a mere acquaintance, the unusual aspects of her testimony and involvement in Phillips's March 2005 statement to Detective Holland stand out and invite scrutiny. Although Lagarde's testimony was facially plausible, knowledge of the fact that she was convicted in 2002 of a felony drug charge could have colored the prism through which the jury viewed her testimony. Accordingly, evidence of that conviction could have been highly probative in a Rule 5–609 balancing analysis.

King also is correct that the potential for unfair prejudice is less here, where the witness to be impeached with evidence of a prior conviction is not the defendant. "Evidence is prejudicial when it tends to have some adverse effect ... beyond tending to prove the fact or issue that justified its admission...." *State v. Askew*, 245 Conn. 351, 362, 716 A.2d 36, 42 (1998) (citation omitted). If the relevant witness is the defendant, the risk of unfair prejudice to her or him is high because " 'the jury may improperly infer that [she or he] has a history of criminal activity and therefore is not entitled to a favorable verdict.' " *Jackson*, 340 Md. at 715, 668 A.2d at 13 (quoting *Ricketts*, 291 Md. at 703, 436 A.2d at 908). Stated otherwise, the jury may feel that " 'if the defendant is wrongfully found guilty[,] no real harm is done.' " *Id.* (quoting *Ricketts*, 291 Md. at 703, 436 A.2d at 908); *see also Westpoint*, 404 Md. at 479, 947 A.2d at 534 (quoting same). For a defendant wishing to tell her or his story to the jury, this translates to a very real prejudice: the defendant may be forced to choose between testifying in her or his own defense with the risk of being convicted by the jury's misuse of impeachment evidence as propensity evidence, on one hand, and not testifying and foregoing a defense, on the other. *See Westpoint*, 404 Md. at 479, 947 A.2d at 534; *Jackson*, 340 Md. at 715, 668 A.2d at 13. Here, however, the State urges that it, as the "objecting party," would have been prejudiced unfairly by evidence of Lagarde's prior conviction because the jury might have inferred that Lagarde currently is dealing drugs. *See* Rule 5–609 (directing court to balance probative value

against "danger of unfair prejudice to witness or objecting party").[10] In doing so, the State overlooks the obvious: neither it nor its impeached witness face the risk of being incarcerated erroneously as the outcome of the case.

We recognize the State's considerable interest in having a defendant "stand before the bar of justice upon the merits" of the crime for which she or he has been charged. *See In re Miles,* 269 Md. 649, 655, 309 A.2d 289, 292 (1973); *see also Gonzales v. State,* 322 Md. 62, 74, 585 A.2d 222, 228 (1991) (noting, "[a] fair trial is the entitlement of the 'People' as well as of an accused"). Although impeachment evidence of a prior conviction used against a State's witness does not create tension with the rule ordinarily prohibiting propensity evidence, *see* Rule 5–404 (prohibiting propensity evidence), as it does when introduced against a defendant, we are mindful, nonetheless, of the possibility that jurors considering a victim/witness's prior conviction may think that the impeached victim/witness is a bad person generally and decide, consequently, to free a defendant that they believe to be guilty. Yet, we think there are two reasons why this possibility, by itself, does not bar otherwise probative impeachment evidence of a prior conviction against a State's witness.

First, the same possibility exists when impeachment evidence of a prior conviction is introduced against a testifying defendant; however, prosecutors regularly are permitted to present such evidence in that instance. *E.g., Jackson,* 340 Md. at 722, 668 A.2d at 16; *State v. Giddens,* 335 Md. 205, 222, 642 A.2d 870, 878 (1994). As mentioned in *Jackson,* jurors considering impeachment evidence of a defendant's prior crime also might believe that the defendant is a bad person and determine that, " 'if the defendant is wrongfully found guilty[,] no real harm is done.' " 340 Md. at 715, 668 A.2d at 13 (quoting *Ricketts,* 291 Md. at 703, 436 A.2d at 908). The State, however, maintains that the present case is different

---

**10.** The State does not argue that Lagarde would have suffered unfair prejudice if her 2002 conviction was made known to the jury.

because part of King's trial strategy involved connecting Phillips and Lagarde to a purported drug dealer (Cat) and Lagarde's conviction was for a drug crime, thereby rendering introduction of her conviction unfairly prejudicial to the State's case. We do not agree. Indeed, in *Jackson*, we allowed the State to impeach the defendant, who was on trial for theft, with a prior theft conviction. *Id.* at 722, 668 A.2d at 16. To be sure, the State's trial strategy in *Jackson* involved portraying the defendant as a thief, given that he was charged with theft. There, we held that the trial court did not abuse its discretion in allowing evidence of the earlier theft conviction because we thought it highly probative under the circumstances. *Id.* Here, as already explained, Lagarde's prior conviction also was highly probative.

Second, when considering the impeachment evidence of a State's witness's prior conviction, the motivation for jurors to use improperly that evidence simply does not exist to the degree that it does when they are considering impeachment evidence of a defendant's prior conviction. Jurors do not have quite the incentive to let a guilty person go free because they dislike the State's witness; they have an interest in protecting their communities. Indeed, we occasionally are moved to chastise prosecutors for exploiting that interest by invoking the "golden rule" argument and asking jurors to consider that interest over the facts in evidence. *See Lee v. State,* 405 Md. 148, 171, 950 A.2d 125, 138 (2008); *Hill v. State,* 355 Md. 206, 214–15, 734 A.2d 199, 204 (1999). The notion that allowing a defendant to impeach a State's witness with evidence of a prior conviction will prejudice unfairly the State's case is not tenable where, as here, the State did not articulate a concrete reason why the jury would be inclined to disregard the court's instructions, about the proper perspective from which to consider an impeaching conviction, merely to see the State's case fail.

We hold that the trial court abused its discretion in not allowing King to impeach Lagarde with evidence of her 2002 felony conviction for possession with intent to distribute mari-

juana; however, we emphasize that in no way are we attempting to fashion here a broad rule governing the admissibility of prior convictions to impeach all State's non-victim, fact witnesses. Our conclusion here is driven by the particular record in this case. First, no forensic evidence linked King to the shooting; the State's case was constructed around Phillips's testimony. Second, Phillips's narrative of events was not consistent or solid, thus enhancing the importance of a corroborating material witness; among other irregularities, he did not contact the police for eight months after his discharge from the hospital. Third, Lagarde is Phillips's fiancée, exposing a possible motive to be less than truthful about how Phillips was shot. Fourth, Lagarde's account of events also had an unusual attribute; she did not call the police or emergency responders when she heard the gunshots over Phillips's phone, opting instead to go looking for him where she believed him to be. Fifth, the record before us indicates that there would have been relatively little potential for unfair prejudice to Lagarde or the State had King been permitted to impeach Lagarde with her 2002 conviction. And finally, the trial judge did not consider—that we may glean from the record—any of the foregoing aspects of this case when he concluded that the prejudice of Lagarde's conviction outweighed its probative value. Rather, he premised his ruling on his view that Lagarde's testimony did not offer "anything at all about the facts of this case," a premise not supported by the record. Therefore, on this record, the trial court's refusal to admit the conviction for impeachment purposes was "untenable" and "violative of fact and logic." *See North*, 102 Md. App. at 14, 648 A.2d at 1032.

▮ Because we are not convinced, beyond a reasonable doubt, that the jury would have found King guilty of attempted murder and related charges if the trial court allowed King to impeach Lagarde with her prior conviction, we are unable to declare the trial court's error harmless. *See Westpoint*, 404 Md. at 487, 947 A.2d at 538. Accordingly, we reverse the Court of Special Appeals and remand with instructions that this case be remanded to the Circuit Court for a new trial.

**708**

JUDGMENT OF THE COURT OF SPECIAL APPEALS
REVERSED; CASE REMANDED TO THAT COURT
WITH DIRECTION TO REVERSE THE JUDGMENT OF
THE CIRCUIT COURT FOR PRINCE GEORGE'S COUN-
TY AND TO REMAND THE CASE TO THE CIRCUIT
COURT FOR A NEW TRIAL; COSTS IN THIS COURT
AND THE COURT OF SPECIAL APPEALS TO BE PAID
BY PRINCE GEORGE'S COUNTY, MARYLAND.

BATTAGLIA and MURPHY, JJ., dissent.

Dissenting Opinion by MURPHY, J., which BATTAGLIA,
J., joins.

I agree with the majority that this Court should not attempt
"to fashion [in the case at bar] a broad rule governing the
admissibility of prior convictions to impeach all State's non-
victim, fact witnesses." I also agree that (1) "when consider-
ing the impeachment evidence of a State's witness's prior
conviction, the motivation for jurors to use improperly that
evidence simply does not exist to the degree that it does when
they are considering impeachment evidence of a defendant's
prior conviction," and (2) as a general rule, the trial judge
should overrule the State's objection to defense counsel's
otherwise proper impeachment by conviction question posed to
a State's witness unless the State is able to "articulate a
concrete reason why the jury would be inclined to disregard
the court's instructions, about the proper perspective from
which to consider an impeaching conviction[.]" From my
review of Ms. Lagarde's entire testimony, however, I am
persuaded that this general rule is inapplicable to the case at
bar.

To comply with the requirements of Md. Rule 5–609, the
Circuit Court was required to balance the "probativeness" of
Ms. Lagarde's conspiracy conviction "against its potential for
unfair prejudice to the witness or to the objecting party."
*Beales v. State,* 329 Md. 263, 273, 619 A.2d 105, 110 (1993).
The express requirement that the trial court consider the
potential for unfair prejudice to the witness, as well as to the

objecting party merely codifies the well established principle that "[t]he trial judge retains discretion to impose reasonable limits on cross-examination to ... prevent harassment, prejudice, confusion of the issues, or inquiry that is ... marginally relevant." *Marshall v. State*, 346 Md. 186, 193, 695 A.2d 184, 187 (1997). An essential component of that balancing process is an analysis of what the witness testified to on direct examination. Ms. Lagarde's testimony on direct was of no real consequence to the issues of (1) when and where Mr. Phillips was shot,[1] and/or (2) the identity of the person or persons who shot Mr. Phillips. Although Ms. Lagarde did testify that she was "on the phone" with Mr. Phillips when she "heard shots," she did not testify that Mr. Phillips identified any of his assailants during this conversation.

If Petitioner had asserted that he shot Mr. Phillips in self-defense, Ms. Lagarde's testimony about Mr. Phillips' spontaneous declaration, "[t]hey just shot me for nothing," would have been of significant consequence to the issue of whether Petitioner had acted in self-defense. That defense, however, was not asserted in the case at bar. According to his trial counsel, Petitioner was a witness rather than a participant.[2] Petitioner's trial counsel told the jurors during his opening statement that, "[m]y client does not deny being there....

---

**1.** The record shows that law enforcement officers and emergency medical personnel responded to reports of gunfire, located Mr. Phillips, and transported him to the Prince George's County Hospital Center.

**2.** The various statements made by Petitioner's trial counsel in support of the argument that Petitioner was a "mere witness" are consistent with (oral and written) statements made by the Petitioner during a December 29, 2005 custodial interrogation. Prior to trial, the Circuit Court granted Petitioner's motion for suppression of those statements on the ground that the State had failed to rebut Petitioner's suppression hearing testimony that his statements were given only because a Secret Service Agent threatened to arrest Petitioner's "common law wife" and mother of Petitioner's "two kids." At no point during the trial, however, did the defense introduce admissible evidence that would have been sufficient to present a genuine jury question on the issue of whether any fact assumed or insinuated by Petitioner's trial counsel—but denied by Ms. Lagarde during her cross-examination—was actually true.

There's no question there was a shooting, but it was not Mr. Darryl King."

Another essential component of the balancing process required by Md. Rule 5–609 is an analysis of what the witness has testified to on cross-examination up to the point at which the trial judge must determine whether to admit or exclude evidence of the witness's prior conviction. During Ms. Lagarde's cross-examination, the Circuit Court permitted Petitioner's trial counsel to question her about whether she had (1) a "business relationship" with Cat, (2) "any dealings with Cat," and/or (3) knowledge of "any type of business relationship" between Mr. Phillips and Cat.[3] It was after she answered these questions in the negative that Petitioner's trial counsel attempted to introduce evidence of Ms. Lagarde's prior conviction.[4] On the basis of what Ms. Lagarde had testified to at that point, I am not persuaded that the Circuit Court abused its discretion in prohibiting Petitioner's counsel from cross-examining Ms. Lagarde about her prior conviction.

It is well settled that the jury's disbelief of a non-party witness does not permit the jury to find that the opposite of what the witness testified to is true. In *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 715 A.2d 188 (1998), while rejecting the contention that the jurors' disbelief of a corporate officer (who denied having acted with fraudulent intent) was sufficient to establish that the officer had acted with knowledge that his representations were false, this Court stated that "[t]he jury's prerogative not to believe certain testimony, however, does not constitute affirmative evidence of the contrary." *Id.* at 711, 715 A.2d at 196. Therefore, even if the jurors found that Ms. Lagarde had intentionally given

---

**3.** Petitioner was entitled to—and did—cross-examine Ms. Lagarde about her relationship with Mr. Phillips, even though she had testified on direct examination that Mr. Phillips was her fiancé.

**4.** Petitioner was entitled to—but did not—cross-examine Ms. Lagarde about the fact that she had given Petitioner's nickname to the investigating officers, and/or about the circumstances under which Mr. Phillips ultimately identified Petitioner as his assailant.

false answers to all of the questions asked by Petitioner's trial counsel, such a finding would not have permitted the jurors to find that any fact assumed and/or insinuated in those questions was true.

In *Gray v. State,* 388 Md. 366, 879 A.2d 1064 (2005), this Court stated:

> As noted by this Court in *Dehn v. Edgecombe,* 384 Md. 606, 865 A.2d 603 (2005):
>
>> " 'Abuse of discretion' is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways.... [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable. That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. That, we think, is included within the notion of 'untenable grounds,' 'violative of fact and logic,' and 'against the logic and effect of facts and inferences before the court.' " *Dehn v. Edgecombe,* 384 Md. at 628, 865 A.2d at 616 quoting *North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025, 1031–1032 (1994).

*Id.* at 383–84, 879 A.2d at 1073–74.

From my analysis of Ms. Lagarde's testimony, I am not persuaded that the Circuit Court's decision to prohibit Petitioner's trial counsel from questioning Ms. Lagarde about her prior conviction was either "violative of fact and logic" or "beyond the fringe" of what is "minimally acceptable." I would therefore (1) decide both issues presented to us, and (2) affirm the judgment of the Court of Special Appeals.

Judge BATTAGLIA has authorized me to state that she joins this dissent.