*Steven G. Carver v. State of Maryland*, No. 14, September Term 2022.  Opinion by Hotten, J.

**CRIMINAL LAW – POSTCONVICTION RELIEF – PETITION FOR WRIT OF ACTUAL INNOCENCE – MATERIALITY ANALYSIS**

Supreme Court of Maryland held that, in evaluating a petition filed under Md. Code Ann., Criminal Procedure ("Crim. Proc.") § 8-301, courts must consider the cumulative effect of newly discovered evidence within the context of the entire adversarial proceeding, including its impact on: (1) any evidence admitted at trial; (2) any evidence available at the time of trial, including both evidence (a) offered but excluded and (b) not offered but available; and (3) the defendant's or defense counsel's trial strategy.  *Faulkner v. State*, 468 Md. 418, 469 n.24, 227 A.3d 584, 614 n.24 (2020).  This hindsight assessment requires courts to ascertain "whether such evidence, combined with the evidence the [jurors] did hear, create[d] a substantial or significant possibility that" a reasonable jury would have acquitted the defendant, that is, whether the cumulative effect of the new evidence and the available evidence at trial undermined the verdict.  *Id.* at 466, 227 A.3d at 612.

**CRIMINAL LAW – POSTCONVICTION RELIEF – PETITION FOR WRIT OF ACTUAL INNOCENCE – EVIDENCE THAT SPEAKS TO ACTUAL INNOCENCE**

Supreme Court of Maryland held that newly discovered evidence "speaks to" a petitioner's actual innocence under Crim. Proc. § 8-301 when it erodes the factual premise of their conviction and potentially exonerates them.  *See Smallwood v. State*, 451 Md. 290, 319, 152 A.3d 776, 792–93 (2017).  Non-exhaustive examples of evidence that "speaks to" an individual's actual innocence include: (1) a confession by another individual to having committed the crime; (2) acknowledgement by an eyewitness or other evidence indicating he was mistaken; (3) acknowledgment by an eyewitness or other evidence indicating that the witness intentionally lied; or (4) evidence casting serious doubt on the reliability of scientific evidence used against the defendant.  *Id.*, 152 A.3d at 792–93 (citing Memorandum from the Governor's Office of Crime Control and Prevention and the Office of the Public Defender to Chairman B. Frosh and Members of the Senate Judicial Proceedings Committee, at 8–9 (Jan. 15, 2009)).  The General Assembly focused the statute on newly discovered evidence that "would potentially exonerate the convicted defendant." *Smallwood*, 451 Md. at 319, 152 A.3d at 793.

**CRIMINAL LAW – POSTCONVICTION RELIEF – PETITION FOR WRIT OF ACTUAL INNOCENCE – DUE DILIGENCE**

Supreme Court of Maryland held that its prior holding in *Hunt v. State*, was limited.  474 Md. 89, 110, 252 A.3d 946, 959 (2021) ("This is (hopefully) a unique class of cases.").

Expert opinions acquired after trial do not constitute new evidence simply because due diligence did not require trial counsel in *Hunt* to uncover Joseph Kopera's fraud prior to 2007. The expert testimony in this case could have been "discovered in time to move for a new trial under Maryland Rule 4-331," rendering such evidence not "newly discovered" within the meaning of Crim. Proc. § 8-301. The actual innocence statute "was created to exonerate the truly innocent, no matter how late that proof may become available, and not simply override the time limits of [Md.] Rule 4-331." *McGhie v. State*, 449 Md. 494, 514–15, 144 A.3d 752, 765 (2016) (McDonald, J., concurring).

Circuit Court for Baltimore City
Case No. 18916403
Argued: October 3, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 14

September Term, 2022

_____

STEVEN G. CARVER

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Hotten, J.
Gould, J., dissents.

_____

Filed: December 20, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

This appeal arises from the petition of Steven G. Carver ("Petitioner") for a writ of actual innocence under Md. Code Ann., Criminal Procedure ("Crim. Proc.") § 8-301. On March 14, 1989, John Green was shot and killed on a populated street in Baltimore City in broad daylight. Petitioner was subsequently arrested for the murder. On November 16, 1989, a jury in the Circuit Court for Baltimore City convicted Petitioner of first-degree murder, use of a handgun in a crime of violence, and wearing or carrying a handgun. The circuit court sentenced Petitioner to life without parole for the first-degree murder charge plus an additional twenty-year term for the handgun offenses.

In 2012, Petitioner filed a petition for writ of actual innocence, arguing that three categories of new evidence created a substantial possibility that the trial would have achieved a different outcome, had the jury considered such evidence. The circuit court denied the petition, finding that the evidence did not address Petitioner's actual innocence, did not constitute newly discovered evidence, and did not create a substantial possibility of a different outcome at trial. Thereafter, Petitioner appealed to the Appellate Court of Maryland (at the time named the Court of Special Appeals of Maryland)[1], which affirmed and held that the circuit court did not abuse its discretion. Petitioner timely appealed to this Court.

This Court granted *certiorari* to address the following questions:

1. As a matter of first impression, when evaluating newly discovered evidence in an actual-innocence proceeding, must a court consider the new evidence and the evidence admitted at trial collectively with

---

[1] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

evidence that was available to the defense but not offered at trial, and/or offered but excluded, where the available evidence was made relevant and admissible by the newly discovered evidence?

2. Where Joseph Kopera was the sole firearms expert at trial, is the contrary opinion of a non-fraudulent firearms expert, obtained after the revelation of Kopera's fraud, newly discovered evidence?

3. Did the lower courts err by failing to consider the cumulative impact of separate but related categories of newly discovered evidence, as required by *Faulkner v. State*, 468 Md. 418[, 227 A.3d 584] (2020)?

4. Did the circuit court err by denying the petition for writ of actual innocence?[2]

This Court answers the first question in the affirmative. Regarding the remaining three questions, this Court answers in the negative and shall affirm the judgment of the Appellate Court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Underlying Factual Background

During the late afternoon of March 14, 1989, Mr. Green died by gunfire on Old York Road, a populated street in Baltimore, Maryland. The State relied on three eyewitnesses to the shooting: Carmelita McIntosh, Hodges Epps, and Arlin Doles.

---

[2] Petitioner also presented a fifth question in his petition for *certiorari*: "Did the circuit court err by failing to serve a body attachment on an important witness and failing to allow a postponement so the witness's presence could be secured during the actual-innocence hearings?" Petitioner failed to raise this question in his brief before us, and, thus, waived the argument. *See* Md. Rule 8-504(a)(6); *DiPino v. Davis*, 354 Md. 18, 56, 729 A.2d 354, 375 (1999) ("[I]f a point germane to the appeal is not adequately raised in a party's brief, the [appellate] court may, and ordinarily should, decline to address it.").

Carmelita McIntosh testified that she was driving down Cator Avenue when she observed three men. She heard a loud "pop" and observed the man in the center falling towards her car. She swerved and drove around him. In her rearview mirror, she saw the man on the right shoot the fallen man in the head. She stopped her car and, as she exited, heard the man on the right state "bust him, yo." Ms. McIntosh testified that she then observed the second man shoot the fallen man. She heard about four or five "pops" in total. Ms. McIntosh described one of the shooters as lighter-skinned and the other as darker-skinned, but did not positively identify Petitioner from a photo array as either of the men.

Another eyewitness, Hodges Epps, testified that he was in a laundromat when he heard the shooting and observed Mr. Green, Petitioner, a man he identified as Arlin Doles, and another unidentified person, together on Cator Avenue.[3] Mr. Epps testified that he grew up with Mr. Green, went to high school with Mr. Doles, and had known Petitioner for six to twelve months prior to the shooting. Mr. Epps observed Petitioner and the unknown man both shoot Mr. Green. Mr. Epps identified Petitioner from a photo array as one of the men who fired at Mr. Green.

Finally, Mr. Doles testified as an eyewitness to the shooting. He testified he had known Mr. Green since high school and that Mr. Green introduced him to Petitioner the night before the murder. Mr. Doles further testified that, on the night he met Petitioner, he

---

[3] Mr. Epps did not personally know Mr. Doles, but he acknowledged they went to the same high school around the same time.

overheard Petitioner and Mr. Green reconcile over some previous disagreement. The next day, prior to the shooting, Mr. Doles, Mr. Green, and Petitioner walked down Cator Avenue when another man, Joe Hodge, approached them. Mr. Doles then recalled hearing a gunshot.[4] Mr. Doles ran up the road and jumped a fence. He heard four additional gunshots. Mr. Doles turned around and observed Mr. Green standing with Petitioner in front of him. Mr. Green grabbed Petitioner's left arm, Petitioner jerked away, and Mr. Green fell to the ground. Mr. Doles testified that Mr. Hodge then fired at the back of Mr. Green's head. He then observed both Petitioner and Mr. Hodge run north on Old York Road with Petitioner in front of an armed Mr. Hodge.[5] After viewing a photo array, Mr. Doles identified Petitioner as a person he saw at the scene and Mr. Hodge as the assailant. Mr. Doles did not see Petitioner with a gun.

---

[4] Mr. Doles recalled Mr. Hodge entering the scene as follows:

As I turned around and looked, I looked [Mr. Hodge] full in the face because I wanted to see who was walking up behind us and that's when he looked at me. Then he turned away. His eyes turned away towards in the direction of where [Mr.] Green was standing. [Mr. Hodge] asked what time it was. At that point, I looked at my watch. But before I could say anything, [Mr. Green] responded and said 4:30 and as I was still watching at my watch, I heard the first shot.

[5] Mr. Doles recalled Petitioner and Mr. Hodge leaving the scene as follows:

They ran north on Old York Road on the right sidewalk. [Petitioner] in front. Mr. Hodge directly behind with the pistol in his hand, like this. At that time, I was unaware of what had happened. So I thought [Mr. Hodge] was going to shoot [Petitioner]. So I was getting ready to holler out for [Petitioner] to watch out. That's when they turned right on 41st Street together and ran down 41st Street.

## II.       Circuit Court Proceedings

a.       <u>The 1989 Trial.</u>

Petitioner and Mr. Hodge were charged with the first-degree murder of Mr. Green, use of a handgun in a crime of violence, and wearing or carrying a handgun, and were tried jointly in the Circuit Court for Baltimore City. Petitioner argued at trial that he was an innocent bystander and that the same person who attacked Mr. Green two months earlier in January 1989 was the actual murderer. At the time of trial, defense counsel was aware Mr. Green had been a witness to the murder of Damon Barrett by Bryant McArthur and that Mr. McArthur later killed Kenneth Alston, the other witness to Mr. Barrett's murder. Defense counsel was also aware that Mr. Green believed Mr. McArthur wanted him dead because he witnessed Mr. Barrett's murder. Additionally, defense counsel was aware Mr. Green believed that Mr. McArthur orchestrated the January 1989 shooting, though Mr. Green did not recognize the perpetrator.

Defense counsel attempted to admit evidence of the January 1989 shooting under the theory that the same person who perpetrated the January 1989 shooting also murdered Mr. Green, but the circuit court denied its admission on grounds of relevancy. The circuit court reasoned that the identity of the January 1989 perpetrator would be relevant and "a complete defense" in this case if Petitioner could establish he was not the January 1989 perpetrator *and* demonstrate that the January 1989 perpetrator killed Mr. Green in March of 1989.

5

Joseph Kopera[6] was called as the State's ballistics expert. He testified that all of the bullets found at the scene were .38 caliber, but four of the six shell casings were too damaged to perform a microscopic analysis, so he could not provide an expert opinion regarding the number of guns used in the murder.[7] On November 16, 1989, a jury convicted Petitioner and Mr. Hodge jointly of the murder of Mr. Green and the accompanying firearms charges. On January 30, 1990, the circuit court sentenced Petitioner to life in prison without the possibility of parole plus a consecutive twenty years.

---

[6] Joseph Kopera was a well-respected firearms identification expert in Maryland for decades and testified in hundreds of trials before it was discovered in 2007 that he had lied about receiving various degrees and his credentials as a firearms identification expert. *See Hunt v. State,* 474 Md. 89, 92 n.1, 252 A.3d 946, 948 n.1 (2021) (detailing Mr. Kopera's fraud). In *Hunt*, this Court held that "in all similarly situated 'Kopera cases,' trial counsel were not expected reasonably to uncover [Mr.] Kopera's deception before 2007, in the absence of specific information that should have put counsel on inquiry notice to investigate sooner [Mr.] Kopera's background." *Id.* at 93, 252 A.3d at 948.

[7] On recross-examination, Mr. Kopera testified as follows:

[THE STATE]: All of these bullets are .38 caliber special. They all have six lands and grooves, left twist and all of the two that absolutely cannot be compared, they came from the same gun?

[MR. KOPERA]: Again, as I testified, counsel, *even on those two, I cannot say that they even definitely came from the same gun* because of the difference in metal and the microscopic comparison of those.

\*     \*     \*

[THE STATE]: The point I'm trying to make is that you are not saying it wasn't the same gun. *You are simply saying you cannot draw a conclusion*.

[MR. KOPERA]: *That's exactly what I said*.

(emphasis added).

b.    The Present Circuit Court Proceeding.

In 2012, Petitioner filed a *pro se* petition for writ of actual innocence in the Circuit Court for Baltimore City, which was denied without a hearing. The Appellate Court reversed and remanded the case for further proceedings. Petitioner thereafter filed an amended petition, which was argued before the circuit court in May and August 2017. Concerning the present appeal, Petitioner alleged that several pieces of newly discovered evidence warranted a new trial, namely:

1. A series of police reports related to threats against the victim, John Green, and an alleged assault on Denise Brewer.

*       *       *

3. False credentials of the State's ballistics expert, Joseph Kopera.

4. Criminal history of Hodges Epps.

(footnote omitted).[8]

Petitioner presented newly discovered evidence of a report Mr. Green filed with the police after someone shot at him in January 1989. In the report, Mr. Green asserted that Mr. McArthur threatened to kill him for being a witness to Mr. Barrett's murder. Petitioner also presented evidence of several police reports detailing an assault on Denise Brewer.

---

[8] Petitioner also alleged to the circuit court that a police report of a conversation between Mr. McArthur and Melvin Jackson, in which Mr. McArthur told Mr. Jackson he planned to pay Petitioner's bail so he would kill Mr. Green, was newly discovered evidence supportive of the petition for actual innocence. Petitioner argued the fact someone other than Mr. McArthur paid Petitioner's bail made this evidence exculpatory and supportive of Petitioner's actual innocence. The circuit court rejected this argument and Petitioner does not argue it in his brief to this Court. *See infra* note 10 (discussing the Mr. Jackson report in detail).

Denise Brewer reported to police that an individual referred to as "Darnell,"[9] a close associate of Mr. McArthur, approached Ms. Brewer in early March of 1989, requesting that she lure Mr. Green to a certain location so "they could 'get him[.]'" She refused. Ms. Brewer also reported to police that "Darryl" or "Darnell" assaulted her on April 10, 1989, shortly after Mr. Green's murder, because she knew who killed Mr. Barrett. Petitioner also presented new evidence concerning open warrants Mr. Epps had at the time of trial. Additionally, Petitioner presented evidence of Mr. Kopera's fraudulent credentials, as well as an affidavit and testimony from William Conrad, a firearms identification expert who reviewed Mr. Kopera's report.[10]

The circuit court rejected Petitioner's contention that this newly discovered evidence would have substantially impacted Petitioner's trial. In a written opinion filed on July 19, 2018, the circuit court determined that Petitioner's defense counsel was aware of the substance of the newly discovered evidence, namely that someone other than Petitioner wanted Mr. Green dead. The circuit court also focused on the strength of the evidence against Petitioner, particularly the three eyewitness accounts of the shooting. The circuit court explained: "the fact that other persons wanted the victim dead, and were soliciting

---

[9] This same individual is also referred to in other parts of the record and lower courts' opinions as "Darryl" or "Armstead." This Court will refer to him as "Mr. Armstead."

[10] Petitioner retained Mr. Conrad in 2009 to review Mr. Kopera's report and testimony. Mr. Conrad testified at Petitioner's actual innocence hearing, and Petitioner submitted his affidavit into evidence. In his affidavit, Mr. Conrad asserted "it is likely that the six recovered bullets all came from the same gun." Mr. Conrad did not examine the bullet fragments himself.

8

others, including Denise Brewer, to help kill the victim, does not in any way eliminate Petitioner as the person who actually did the killing."

The circuit court also found that the false credentials of Mr. Kopera did not constitute newly discovered evidence, since defense counsel could have examined those credentials prior to trial. Additionally, the circuit court also found that the false credentials would not create a significant possibility of a different outcome at trial, reasoning that Mr. Kopera's testimony did not advance the State's case because Mr. Kopera could not conclude how many guns were used, given the poor condition of the shell fragments. The circuit court also determined Mr. Conrad's opinion was not newly discovered because "Petitioner's trial counsel could have easily retained an expert to provide the same evaluation."

The circuit court likewise determined Mr. Epps's open warrants for violation of probation issued at the time of his testimony were neither newly discovered evidence, nor did they create a substantial possibility of a new outcome. The circuit court reasoned that defense counsel could have discovered that information at trial through a simple background check. The circuit court also found that the pending violation would, at best, be used for impeachment, and the record does not show that Mr. Epps was aware of the warrants because they were never served. Since Petitioner failed to meet his burden for his actual innocence claim, the circuit court denied the petition.

### III.  Opinion of the Appellate Court of Maryland

The Appellate Court affirmed and held that the circuit court did not abuse its discretion in determining that the newly discovered evidence of Mr. McArthur's attempts

to hire someone to kill Mr. Green did not generate a substantial possibility of a different outcome at trial. *Carver v. State*, No. 2042, Sept. Term, 2018, 2022 WL 971963, at *6–7 (Md. Ct. Spec. App. Mar. 31, 2022). The court reasoned that the "evidence simply elaborated on information previously known about [Mr.] McArthur's attempts to hire someone to kill [Mr.] Green[.]" *Id.* at *6.

The Appellate Court also held that evidence of Mr. Epps's unserved arrest warrants was not newly discovered, since defense counsel was aware of Mr. Epps's criminal history at the time of trial and could have reviewed the warrants. *Id.* at *6–7. The court further determined that, if evidence of the outstanding warrants constituted newly discovered evidence, such evidence would not have created the significant possibility of a different outcome. *Id.* at *6–7.

The State conceded the circuit court erred in determining that Mr. Kopera's fraud was not newly discovered evidence predicated on this Court's holding in *Hunt v. State*, which provided that in this and "all similarly situated cases tried prior to the 2007 discovery of [Mr.] Kopera's fraud, in the absence of particularized facts that would have put defense counsel on inquiry notice of [Mr.] Kopera's fraud, due diligence did not require defense counsel to unearth the unfortunate charade." *Id.* at *8 (citing *Hunt v. State*, 474 Md. 89, 110, 252 A.3d 946, 958 (2021)). Nonetheless, the Appellate Court agreed with the circuit court "there [was] no significant possibility of a different result if the alleged newly discovered evidence had been known[,]" because Mr. Kopera's testimony "added little, if any, support to the State's case[.]" *Carver*, 2022 WL 971963, at *8. The Appellate Court did not address Mr. Conrad's opinion.

10

Petitioner filed a petition for *certiorari*, which we granted on July 8, 2022. *Carver v. State*, 479 Md. 455, 278 A.3d 761 (2022).

## STANDARD OF REVIEW

This Court reviews a circuit court's denial of a petition for a writ of actual innocence for an abuse of discretion. *See Faulkner v. State*, 468 Md. 418, 460, 227 A.3d 584, 608 (2020). We accept the factual findings of the circuit court unless clearly erroneous and will "not reverse a [circuit court's] discretionary determination unless it is 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Id.*, 227 A.3d at 608–09 (quoting *King v. State*, 407 Md. 682, 697, 967 A.2d 790, 799 (2009)). It is an abuse of discretion for the circuit court to apply an incorrect legal standard in reaching its conclusion. *Faulkner*, 468 Md. at 460–61, 227 A.3d at 609.

## PARTIES' CONTENTIONS

### I.      Petitioner's Brief

First, Petitioner argues the circuit court erred by determining that evidence of Mr. McArthur's conspiracy did not address Petitioner's innocence, nor did it create a substantial possibility of a different verdict. According to Petitioner, evidence of Mr. McArthur's conspiracy "speaks to" his innocence since it points to another perpetrator of Mr. Green's murder.

Petitioner contends the circuit court applied the incorrect legal standard under *Faulkner*, 468 Md. at 463, 227 A.3d at 610, since it failed to cumulatively assess the impact of the newly discovered evidence and any related evidence available at trial, including

11

evidence that was both (1) offered and excluded and (2) not offered but available. Petitioner maintains that the circuit court improperly required Petitioner to establish his innocence, rather than focusing on whether the newly discovered evidence eroded confidence in the verdict. Petitioner also argues the circuit court ignored how the newly discovered evidence undermines the verdict because it suggests police rushed to prosecute Petitioner without investigating Mr. McArthur or Mr. Armstead. Petitioner contends that his trial counsel, armed with the new evidence and related evidence available at trial, would have presented a robust and persuasive theory that someone else killed Mr. Green.

Second, Petitioner also asserts the circuit court erred in not appreciating the materiality of Mr. Kopera's fraud, since his testimony showed that two people fired at Mr. Green. Petitioner asserts that a different expert would have examined the bullets and testified had Mr. Kopera's fraud been timely discovered. According to Petitioner, Mr. Conrad's opinion shows that a competent expert would conclude that the bullets came from a single gun.

Petitioner lastly argues the circuit court erred when it found that trial counsel could have discovered Mr. Epps's outstanding warrants with due diligence and that this evidence was immaterial. Petitioner asserts the circuit court ignored the pretrial protective order that withheld the names of civilian witnesses before trial. Petitioner contends that his trial counsel did not have time to search for open warrants before trial and had no reason to search for them after trial, because the responsibility to disclose the existence of those warrants fell on the State. Petitioner also asserts that evidence of Mr. Epps's open warrants was material because it demonstrates that Mr. Epps possessed a motive to lie to the jury in

12

exchange for leniency from the State. According to Petitioner, defense counsel could have used this to impeach Mr. Epps and, thus, undermine a crucial witness and the entire police investigation.

Analyzing the cumulative effect of the newly discovered evidence and related evidence available at trial, Petitioner presents the following story: Six months before Mr. Green's death, Mr. Green and Mr. Alston witnessed Mr. McArthur kill Mr. Barrett. Mr. McArthur wanted to silence all witnesses, so he initially killed Mr. Alston, Petitioner's close friend, a few days later. Then, Mr. McArthur threatened to kill Mr. Green between January and March of 1989. Someone attempted to shoot Mr. Green in January of 1989. While Mr. McArthur and Mr. Armstead were incarcerated, they attempted to solicit other people, such as Ms. Brewer, to help kill Mr. Green. Eventually, Mr. McArthur and Mr. Armstead successfully solicited either Mr. Hodge or a third-party perpetrator to kill Mr. Green. According to Petitioner, he was an innocent bystander who happened to observe Mr. Green's death. At trial, an alternate expert would have testified that only one gun was used to murder Mr. Green. Petitioner's trial counsel would have impeached Mr. Epps, the only witness who testified to Petitioner shooting Mr. Green, by showing he had a motive to lie in the hopes of leniency because of his outstanding warrants. Petitioner's counsel would have demonstrated that Petitioner had no motive to kill Mr. Green because they were friends. Petitioner's counsel would have also shown that Petitioner had no motive to assist Mr. McArthur, who was from a rival neighborhood and had previously killed his close friend, Mr. Alston. In Petitioner's view, this version, in hindsight, exonerates or entitles him to a new trial.

13

## II.       The State's Brief

In contrast, the State argues the circuit court applied the appropriate cumulative analysis under *Faulkner* when it assessed Petitioner's petition.  According to the State, Petitioner and trial counsel were aware of most of the information related to the newly discovered evidence, such as Mr. McArthur's plot to kill Mr. Green, the circumstances of Mr. Barrett's death, the circumstances of Mr. Alston's death, and the affiliation of Mr. Green and Mr. McArthur with rival neighborhoods.  According to the State, Petitioner's new evidence only permits speculative conclusions by bolstering what Petitioner already knew at trial.  The State emphasizes that the circuit court, after considering the weight of the testimony of the three eyewitnesses at trial, did not abuse its discretion when it found that the newly discovered evidence did not undermine the verdict.

Regarding Mr. Kopera's testimony, the State contends Petitioner could have consulted with his own ballistics expert.  The State asserts that Mr. Kopera's fraudulent credentials are immaterial, because Mr. Kopera's testimony was inconclusive and did not significantly contribute to the State's case.  In the State's view, Mr. Kopera's sole contribution to its case in chief was his opinion that it was possible that more than one person fired at Mr. Green.  The State also emphasizes that Mr. Conrad's testimony in 2009 was inconclusive because he could not confirm whether the bullets came from the same gun.

Regarding Mr. Epps's outstanding warrants, the State argues Petitioner's trial counsel had ample opportunity to search those records.  The State further contends Petitioner subverts the due diligence standard by asserting his trial attorney had no basis to

14

search for readily available evidence. The State contends the open warrants cannot be material when Mr. Epps did not know of them because they were never served.

Finally, the State argues the circuit court applied the correct cumulative analysis. The State, again, highlights the strength of its three eyewitnesses at trial and asserts that Petitioner overestimates the strength of the new evidence.

## ANALYSIS

I. **A petition for writ of actual innocence requires an evaluation of the materiality of newly discovered evidence predicated on its cumulative impact on evidence admitted at trial and both evidence offered but excluded and not offered but available at trial.**

Md. Code. Ann., Crim. Proc. § 8-301(a) governs petitions for writs of actual innocence and provides, in relevant part:

(a) A person charged by indictment or criminal information with a crime triable in circuit court and convicted of that crime may, at any time, file a petition for writ of actual innocence in the circuit court for the county in which the conviction was imposed if the person claims that there is newly discovered evidence that:

(1)(i) if the conviction resulted from a trial, creates a substantial or significant possibility that the result may have been different, as that standard has been judicially determined; or

(ii) if the conviction resulted from a guilty plea, an Alford plea, or a plea of nolo contendere, establishes by clear and convincing evidence the petitioner's actual innocence of the offense or offenses that are the subject of the petitioner's motion; and

(2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331.

15

Under Crim. Proc. § 8-301(a), a petitioner must produce newly discovered evidence that: (1) "speaks to" his or her actual innocence[11]; (2) could not have been discovered in time to move for a new trial under Maryland Rule 4-331; and (3) creates a "substantial or significant possibility" that, if his or her jury had received such evidence, the outcome of his or her trial may have been different. *Faulkner*, 468 Md. at 459–60, 227 A.3d at 608 (citing *Smith v. State*, 233 Md. App. 372, 422, 165 A.3d 561, 590 (2017)).

The first prong limits relief to "a petitioner who makes a threshold showing that he or she may be actually innocent, meaning he or she did not commit the crime." *Id.* at 460, 227 A.3d at 608 (internal quotations and citation omitted). Under the second prong, Maryland Rule 4-332(d)(6) imposes a "due diligence" standard under which the defendant must "act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and *the facts known to him or her*." *Hunt*, 474 Md. at 108, 252 A.3d at 958 (emphasis added). The third prong requires a materiality analysis under a standard that "falls between 'probable,' which is less demanding than 'beyond a reasonable doubt,' and 'might,' which is less stringent than 'probable.'" *Faulkner*, 468 Md. at 460, 227 A.3d at 608 (quoting *McGhie v. State*, 449 Md. 494, 510, 144 A.3d 752, 762 (2016)). To meet this standard, the cumulative effect of newly discovered evidence, viewed in the context of the entire record, must "undermine confidence in the verdict." *See Strickler v. Greene*, 527 U.S. 263, 290, 119 S. Ct. 1936, 1952 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 435,

---

[11] In *Smallwood v. State*, this Court clarified that "actual innocence" means "the defendant did not commit the crime or offense for which he or she was convicted." 451 Md. 290, 313, 152 A.3d 776, 789 (2017).

16

115 S. Ct. 1555, 1566 (1995)); *see also Faulkner*, 468 Md. at 463, 227 A.3d at 610 (holding that the cumulative materiality analysis for actual innocence petitions is the same as those for claims under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984)).

The State does not challenge Petitioner's assertion that the significance and relevance of the newly discovered evidence must be examined in light of its cumulative effect on evidence available at the time of trial. In *McGhie*, this Court held that Crim. Proc. § 8-301(a)(1) requires a "retrospective approach that considers the impact of the newly discovered evidence at the trial that occurred." 449 Md. at 511, 144 A.3d at 762. Likewise, in *Faulkner*, 468 Md. at 463, 227 A.3d at 610, this Court held that "a cumulative materiality analysis is required in actual innocence cases[,]" treating the analysis as identical to other materiality analyses required for violations under *Brady*, 373 U.S. at 87–91, 83 S. Ct. at 1196–98, or claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. at 694–96, 104 S. Ct. at 2068–69. This Court explained:

> [I]n analyzing the materiality of multiple items of newly discovered evidence for purposes of an actual innocence petition, a circuit court must conduct a cumulative analysis. A cumulative assessment is necessary for two reasons. First, in some cases, no one distinct item of newly discovered evidence will suffice on its own to warrant relief, but cumulatively, such evidence will create a substantial or significant possibility of a different result. Second, even if one or more distinct pieces of newly discovered evidence independently justifies the granting of the writ, a cumulative analysis may affect the court's determination of the appropriate remedy.

*Faulkner*, 468 Md. at 464, 227 A.3d at 611 (footnote omitted).

This Court provided the following guidance in implementing this materiality analysis:

> In ruling on the merits of an actual innocence petition, a circuit court may decide to begin and end its materiality review with a cumulative analysis of the various pieces of newly discovered evidence before it. However, for purposes of appellate review, we believe it generally is a sound practice for a circuit court first to consider the materiality of each piece of newly discovered evidence independently, and then to conduct a cumulative analysis.

*Id.* at 464 n.22, 227 A.3d at 611 n.22.

In a footnote, this Court stated that "the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record" and "newly discovered evidence can logically and reasonably lead to other evidence, not necessarily new, which would then take on new dimensions and importance." *Id.* at 469 n.24, 227 A.3d at 614 n.24 (internal citations and quotations omitted).

Accordingly, courts evaluating the materiality of newly discovered evidence under Crim. Proc. § 8-301 must consider the cumulative effect of the new evidence within the context of the entire adversarial proceeding. *Id.*, 227 A.3d at 614 n.24. Courts must evaluate how that new evidence would impact: (1) any evidence admitted at trial; (2) any evidence available at the time of trial, including evidence both (a) offered but excluded and (b) not offered but available; and (3) the defendant's or defense counsel's trial strategy. *See id.*, 227 A.3d at 614 n.24. This hindsight assessment requires courts to ascertain "whether such evidence, combined with the evidence the [jurors] did hear, create[d] a substantial or significant possibility that" a reasonable jury would have acquitted the defendant, that is, whether the cumulative effect of the new evidence and the available evidence at trial undermined the verdict. *Id.* at 466, 227 A.3d at 612.

We conclude that the circuit court correctly applied the aforementioned standard.

18

**II. Petitioner failed to show that the circuit court abused its discretion in denying his petition for actual innocence.**

The circuit court did not abuse its discretion in determining that Petitioner's alleged newly discovered evidence did not merit granting the petition for writ of actual innocence. Contrary to Petitioner's assertions, the circuit court applied the correct legal standard by considering the effect of the newly discovered evidence on the available evidence at trial. Indeed, the court determined, in its discretion and in light of the available evidence at the time of trial, that the alleged newly discovered evidence did not create a substantial or significant possibility that the outcome of the trial would have been different, particularly considering the weight of evidence against Petitioner, including the three eyewitness accounts of the shooting.

    a. The report of Mr. McArthur's threats against the victim and the reports of the incidents surrounding the assault of Ms. Brewer.

The circuit court correctly held that neither Mr. Green's report of the January 1989 shooting, nor Ms. Brewer's report regarding solicitations to assist in murdering Mr. Green, spoke to Petitioner's innocence or created a substantial or significant likelihood that the outcome of the trial would have been different.

First, this evidence does not erode the factual premise of Petitioner's conviction. In *Smallwood*, this Court discussed the types of evidence that could support a claim for actual innocence under Crim. Proc. § 8-301 and, by extension, the types of evidence that "speak to" a petitioner's innocence. 451 Md. at 319, 152 A.3d at 792–93. This evidence includes:

> (1) a confession by another individual to having committed the crime; (2) acknowledgement by an eyewitness or other evidence indicating he was mistaken; (3) acknowledgment by an eyewitness or other evidence indicating

19

that the witness intentionally lied; or (4) evidence casting serious doubt on the reliability of scientific evidence used against the defendant.

*Id.*, 152 A.3d at 792–93 (citing Memorandum from the Governor's Office of Crime Control and Prevention and the Office of the Public Defender to Chairman B. Frosh and Members of the Senate Judicial Proceedings Committee, at 8–9 (Jan. 15, 2009)). Although the enumerated list is not exhaustive, this Court recognized that the General Assembly focused the statute on newly discovered evidence that "would *potentially exonerate* the convicted defendant." *Smallwood*, 451 Md. at 319, 152 A.3d at 793 (emphasis added).

Here, Petitioner's evidence reflects that Mr. McArthur attempted to solicit other people to murder Mr. Green, but that does not discount Petitioner, who was present at the scene, as a suspect in the murder of Mr. Green. Indeed, another piece of newly discovered evidence presented by Petitioner at trial, although not presented to this Court on appeal, was a report of a jailhouse conversation between Mr. McArthur and Melvin Jackson, in which Mr. Jackson reported that Mr. McArthur planned to pay Petitioner's bail *so that Petitioner could kill Mr. Green*.[12] In short, this new evidence does not have the potential to exonerate Petitioner.

---

[12] In a report dated April 5, 1989, Mr. Jackson described his interaction with Mr. McArthur in jail during the first week of March 1989:

> "If someone can take care of Big John I can get out of here." [Mr.] Jackson was aware that [Mr.] Green was to testify against [Mr.] McArthur. [Mr.] McArthur then asks what kind of bail [Mr.] Jackson has, when he replies none, [Mr.] McArthur states that[']s okay, I got this guy, pointing to an individual playing basketball. This person is identified as Steven Carver. [Mr.] McArthur [identifies] this person as Charles, from Cherry [H]ill, that

(continued . . .)

20

Regarding materiality, this Court holds that the circuit court did not abuse its discretion. The circuit court properly focused on the three unrelated eyewitness accounts that there were two men who killed Mr. Green.

The case at bar is distinguishable from *Faulkner*, which held that "strong alternate perpetrator evidence can be very powerful in the defense of a person accused of a crime where the primary issue in dispute is identity." 468 Md. at 468, 227 A.3d at 613 (citation omitted). In *Faulkner*, the State theorized at trial that the two petitioners, Mr. Smith and Mr. Faulkner, broke into the victim's house through a window to burglarize it and then murdered the victim when she discovered them. *Id.* at 438–44, 227 A.3d at 595–99. There, the petitioners presented new evidence that handprints on the open window of the victim's home belonged to a man named Ty Brooks, and that another man, William Thomas, confessed to committing the crime with Ty Brooks, providing details unknown to the public at the time. *Id.* at 469, 227 A.3d at 613. Regarding the significance of this newly discovered evidence, we explained "[t]his is not a case in which a petitioner has come

---

(. . . continued)

he is a part of Joe Edisons crowd, [Mr.] McArthur says he is going to pay his bail for "The Hit". [sic] [Mr.] Jackson states the second shooter of John Green is "Lightskin", [sic] Joe Ray Hodge, already in custody.

During the May 10, 2017 hearing, Petitioner's trial counsel testified he would not have called either Mr. Jackson or Mr. McArthur in light of this report. Instead, Petitioner's trial counsel testified he might have used the report "to cross examine Detective David John Brown about certain aspects of an investigation where people were coming out of the woodwork to try and benefit themselves or to work for [Mr.] McArthur." The circuit court ultimately rejected Petitioner's arguments that this new evidence was exculpatory because it would have provided the State with "a perfect motive" for why Petitioner killed Mr. Green.

forward with only conjecture or speculation that another person may have committed the crime for which the petitioner was convicted." *Id.* at 468, 227 A.3d at 613.  Rather, the petitioner presented ample, concrete, and compelling newly discovered evidence of an alternate perpetrator.[13]

---

[13] This Court summarized the newly discovered evidence in *Faulkner*, and its effect on other information known at the time of trial, as follows:

> The newly discovered palm print evidence shows – and the State does not dispute – that Ty Brooks entered [Ms.] Wilford's home through the window that MSP initially determined was used by the burglar(s) and murderer(s) on January 5, 1987. It also is undisputed that: (1) Ty Brooks had no legitimate right of access to the Wilford home; (2) no prior break-in was reported by [Ms.] Wilford to police; (3) Ty Brooks has a substantial criminal history, including burglaries in the Easton area in 1986–87; indeed, he admitted to Sgt. Metzger that he "terrorized Easton" during this period of time; (4) Ty Brooks falsely claimed never to have been in [Ms.] Wilford's home; and (5) [William] Thomas also has a substantial criminal history going back to the 1980s, which includes armed robbery and other crimes in Talbot County.

> \*       \*       \*

> We also find significant that, in 1991 and 1992, James Brooks told MSP that [Mr.] Thomas had confessed to burglarizing [Ms.] Wilford's home with Ty Brooks and to having stabbed her to death with a butcher knife – a detail that was not then known to the public. This provides important corroboration of [Mr.] Smith's and [Mr.] Faulkner's theory that [Mr.] Thomas and Ty Brooks are responsible for [Ms.] Wilford's murder.

> Taken together, the Ty Brooks palm print match, [Mr.] Thomas's confession (including James Brooks's written statement that [Mr.] Thomas identified Ty Brooks as his accomplice), and the related evidence concerning Ty Brooks and [Mr.] Thomas create a substantial or significant possibility that [jurors] hearing that evidence would not have found [Mr.] Smith and [Mr.] Faulkner guilty beyond a reasonable doubt.

468 Md. at 468–70, 227 A.3d at 613–14 (emphasis and footnotes omitted).

In contrast, Petitioner's alleged newly discovered evidence regarding Mr. McArthur's conspiracy is primarily "conjecture and speculation[,]" and fails to undermine confidence in Petitioner's conviction. Petitioner asserts that, with this newly discovered evidence, he could have brought more information into trial about Mr. McArthur's conspiracy to kill Mr. Green and show Petitioner had nothing to do with that conspiracy. Unlike *Faulkner*, Petitioner's alternate perpetrator evidence is not as compelling because he concedes he was present during Mr. Green's murder and subsequently ran from the crime scene. At face value, Petitioner offers new evidence that an imprisoned individual sought the victim's death and, through a speculative chain of events, *perhaps* successfully enlisted Mr. Hodge or some phantom third-party assailant. The circuit court properly declined to adopt Petitioner's reasoning. A reasonable jury could believe the following two facts and still convict Petitioner: (1) Mr. McArthur plotted Mr. Green's death; and (2) Petitioner and Mr. Hodge happened to kill Mr. Green first. Accordingly, the circuit court did not err when it determined the newly discovered evidence was not substantially likely to produce a different outcome at trial.

Petitioner contends he was not associated with Mr. McArthur, since they were from rival neighborhoods and Mr. McArthur was responsible for Mr. Alston's murder. None of this evidence meaningfully casts doubt on the powerful eyewitness testimony that Petitioner and Mr. Hodge killed Mr. Green. Accordingly, it was not an abuse of discretion for the circuit court to find the cumulative evidence did not create substantial or significant likelihood of a different outcome at trial necessary for the court to grant his petition for actual innocence.

23

b.      Mr. Kopera's fraud and Mr. Conrad's opinion

This Court also rejects Petitioner's assertion that the opinion of the firearms identification expert, William Conrad, constitutes newly discovered evidence in light of Mr. Kopera's fraud.[14]  Petitioner reasons that, at the time of trial, Mr. Kopera's reputation was so impeccable, it was not reasonable to engage another firearms identification expert to examine the bullet casings in evidence.  Accordingly, Petitioner presents as new evidence a 2009 affidavit and testimony of Mr. Conrad, a firearms identification expert who reviewed Mr. Kopera's report[15] on the bullet fragments in Petitioner's case after Mr. Kopera's fraud was uncovered.  In his opinion, Mr. Conrad agreed with Mr. Kopera's conclusion that it was impossible to determine how many guns were used in the murder because four out of the six bullet fragments were too mutilated for a microscopic analysis.  Mr. Conrad also opined that, in his own experience, he had never seen a case where multiple bullets in a single incident contained the same general markings but came from two different guns.

Petitioner asserts Mr. Conrad's affidavit and testimony constitutes newly discovered evidence within the meaning of Crim. Proc. § 8-301(a).  Petitioner misreads this Court's holding in *Hunt*, 474 Md. at 110, 252 A.3d at 959.  In that case, we held that, "in this and

---

[14] The circuit court did not have the benefit of *Hunt v. State*, 474 Md. 89, 252 A.3d 946 (2021), when it rendered its decision.  Nevertheless, we hold the circuit court correctly concluded that Mr. Conrad's report was not newly discovered evidence or material.

[15] Mr. Conrad did not actually review the bullet fragments himself, which could not be located 20 years after the trial.

24

all similarly situated cases tried prior to the 2007 discovery of [Mr.] Kopera's fraud, in the absence of particularized facts that would have put defense counsel on inquiry notice of [Mr.] Kopera's fraud, due diligence did not require defense counsel to unearth the unfortunate charade." *Id.* at 110, 252 A.3d at 959. This Court never held that an expert opinion acquired after trial constituted new evidence, simply because due diligence did not require trial counsel to uncover Mr. Kopera's fraud prior to 2007.

In *Hunt*, this Court described what qualifies as "newly discovered evidence" within the context of Maryland Rule 4-331(c), which is equally applicable to actual innocence proceedings under Crim. Proc. § 8-301:

> Whether evidence is newly discovered has two aspects: a "temporal one," that is, when the evidence was discovered; and a "predictive one," that is, when it "should" or "could" have been discovered. "Due diligence" is relevant to the latter aspect, and, in this context, "contemplates that the defendant act reasonably and in good faith to obtain the evidence, in light of the totality of the circumstances and the facts known to him or her."

*Id.* at 108, 252 A.3d at 957 (citations omitted).

In that case, this Court rejected the proposition that, "in a more perfect world," Mr. Kopera's fraud *could* have been discovered with due diligence because no defense counsel had cause to question his widely accepted credentials prior to 2007. *Id.* at 109–10, 252 A.3d at 958–59. In its holding, this Court sought to avoid a "cramped and unrealistic notion" of the due diligence standard. *Id.*, 252 A.3d at 958.

In the case at bar, although the evidence of Mr. Kopera's fraud was newly discovered evidence under *Hunt*, Mr. Conrad's 2009 opinion was not newly discovered evidence. At the actual innocence proceeding, Mr. Conrad testified that "it's not probable

25

[the bullets] could have come from one gun; *but I can't say for sure without examining the bullets themselves.*" (emphasis added). Regardless of the inconclusive nature of his testimony, Mr. Conrad reveals the obvious: defense counsel had the option to hire his own ballistics expert, like Mr. Conrad, to examine the bullet fragments and testify at the time of trial, but he elected not to do so. *See McGhie*, 449 Md. at 514–15, 144 A.3d at 765 (McDonald, J., concurring) ("[Crim. Proc.] § 8-301 was created to exonerate the truly innocent, no matter how late that proof may become available, and not simply override the time limits of [Md.] Rule 4-331."). Unlike Mr. Kopera's fraudulent credentials in *Hunt*, Mr. Conrad's conclusions could have been "discovered in time to move for a new trial under Maryland Rule 4-331," making such evidence not newly discovered within the meaning of Crim. Proc. § 8-301. Mr. Kopera's favorable reputation at the time of trial did not negate Petitioner's ability to hire his own expert or obviate the value of having such an expert.

Assuming, *arguendo*, Mr. Conrad's opinion qualifies as newly discovered evidence, it does not create a substantial likelihood that Petitioner's trial would have achieved a different outcome. In *McGhie*, another case involving Mr. Kopera, this Court held that "[i]f the jury is made aware that the expert lied about his qualifications, the jury might also reasonably find that *other aspects of the expert's testimony* are not reliable." 449 Md. at 512, 144 A.3d at 763 (emphasis added) (footnote omitted). In that case, we noted it was not substantially likely that jurors, armed with knowledge of Mr. Kopera's fraud, would reasonably have distrusted the credibility of the State's other witnesses at trial. *Id.* at 512 n.8, 144 A.3d at 763 n.8. Here, a reasonable jury could discount Mr. Kopera's testimony

26

in its entirety, while still convicting Petitioner based on the other credible witnesses at trial. Contrary to Petitioner's assertions, Mr. Kopera's testimony was not particularly helpful to the State's case because he could not say for certain whether the recovered bullets were derived from one or multiple firearms. Mr. Conrad agreed with Mr. Kopera's conclusion and stated in the innocence hearing that he likewise could not say with certainty how many firearms were used. Thus, the newly discovered evidence hardly conflicts with the evidence presented by the State at trial, which was evidence that was not particularly helpful to the State's case in the first place. Accordingly, this Court holds that the circuit court did not abuse its discretion in determining that Mr. Conrad's opinion did not create a substantial or significant likelihood that the outcome in Petitioner's trial would have been different.

      c.    <u>Petitioner's trial counsel could have discovered Mr. Epps's open warrants with due diligence, and the evidence does not undermine the verdict.</u>

This Court is also not persuaded by Petitioner's assertion that Mr. Epps's criminal history constitutes newly discovered evidence within the meaning of Crim. Proc. § 8-301. Petitioner alleges that Mr. Epps had two open arrest warrants due to violating probation at the time of trial, which could have been used as impeaching evidence by the defense and should have been disclosed by prosecutors.

In *State v. Ebb*, this Court held that a witness's renouncement of his previous trial testimony constituted newly discovered evidence because the petitioner had no reason to be aware that the witness would falsely implicate him at trial. 452 Md. 634, 656–57, 158 A.3d 965, 978–79 (2017). Defense counsel in the case at bar could have easily discovered

27

the open arrest warrants at the time of trial by diligently executing a simple background check, unlike the recanted testimony in *Ebb*.

Petitioner argues that, due to a protective order, defense counsel did not receive any information about testifying witnesses until shortly before trial, and, thus, did not have the opportunity to perform a background check on Mr. Epps. Contrary to Petitioner's assertions, Crim. Proc. § 8-301(a)(2) and Maryland Rule 4-331(c) expressly provide defense counsel with a limited opportunity to diligently discover evidence *after* trial. Crim. Proc. § 8-301(a)(2) (limiting "newly discovered evidence" to evidence that "could not have been discovered in time to move for a new trial under Maryland Rule 4-331"); Md. Rule 4-331(c) ("The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by *due diligence in time to move for a new trial pursuant to section (a) of this Rule*[.]") (emphasis added). Defense counsel certainly had the opportunity to perform a background check on Mr. Epps, who counsel characterized as the State's "most important witness," in time to move for a new trial under Maryland Rule 4-331. As such, the circuit court did not abuse its discretion when it determined that Mr. Epps's criminal history did not constitute "newly discovered evidence" within the meaning of Crim. Proc. § 8-301.

Assuming, *arguendo*, that Mr. Epps's criminal history constituted "newly discovered" evidence, it does not create a "substantial or significant possibility" that the outcome of the trial would have been different. In *Ebb*, this Court held that new evidence of a trial witness who lied at trial would have undermined the petitioner's robbery and felony murder convictions. 452 Md. at 657–661, 158 A.3d at 979–81. This Court reasoned

28

the State would have had a difficult time establishing the necessary elements to robbery and felony murder, without the witness's testimony regarding petitioner's intent to commit armed robbery and petitioner's identity as the murder culprit. *Id.* at 657–661, 158 A.3d at 979–81. Unlike the compelling new evidence in *Ebb*, evidence of Mr. Epps's open arrest warrants carries little weight because it would, at best, be impeachment evidence. Additionally, Mr. Epps was likely unaware of his open arrest warrants because they were never served. Contrary to Petitioner's assertions, it is unlikely that he was motivated to lie in his testimony in exchange for leniency. Furthermore, Mr. Epps's consistency with the other two eyewitnesses also supports this Court's view that impeachment evidence against Mr. Epps for two unrelated and unserved warrants did not create a substantial likelihood of a different outcome in Petitioner's trial.

d. The circuit court applied the proper legal standard in this case.

Finally, this Court disputes Petitioner's assertion that the courts below failed to consider the cumulative effect of the newly discovered evidence. As discussed above, this Court holds that neither Mr. Conrad's opinion nor Mr. Epps's criminal history constitute newly discovered evidence within the meaning of Crim. Proc. § 8-301 and were properly excluded under the cumulative analysis. Assuming, *arguendo*, that this Court considered *all* of Petitioner's newly discovered evidence under the cumulative analysis, it was not an abuse of discretion for the circuit court to determine that the evidence did not create a substantial likelihood of a different outcome in Petitioner's trial. Petitioner overstates the value of his newly discovered evidence. Petitioner would, at best, show that an imprisoned Mr. McArthur wanted to kill Mr. Green.

29

Although Petitioner correctly notes he does not need to establish his innocence beyond a reasonable doubt under Crim. Proc. § 8-301 and that it is not his responsibility to solve the State's case, he must still contend with the evidence against him. The three eyewitnesses corroborated each other's testimony concerning the shooting and individuals present at the scene. Contrary to Petitioner's assertions, evidence of Mr. Epps's open warrants carries little impeachment value because nothing suggests he was aware of the existence of the warrants. Regarding expert testimony, Mr. Conrad's opinion only offers the same inconclusive testimony Mr. Kopera provided at trial.

The circuit court found that a reasonable juror, upon considering the new evidence and any other evidence available at trial, would not be substantially likely to decide this case differently if Petitioner's trial counsel "argue[d] that there was some other phantom person who, in broad daylight, shot the victim and escaped unnoticed." We agree. Petitioner's new evidence similarly does not carry much mileage in convincing a reasonable juror that Mr. Hodge, alone, killed Mr. Green because "he was from [Mr.] Armstead and [Mr.] McArthur's neighborhood." This Court is not persuaded that Petitioner's newly discovered evidence, and any speculative conclusions drawn therefrom, "put[s] the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290, 119 S. Ct. at 1952. Consequently, this Court holds that it was within the circuit court's discretion to deny Petitioner's petition for writ of actual innocence.

## CONCLUSION

Petitioner failed to meet his burden under Crim. Proc. § 8-301. Evidence of Mr. McArthur's plot does not "speak to" Petitioner's innocence because it does not erode the factual basis of the conviction. Evidence of Mr. McArthur's plot is immaterial since it is "conjecture and speculation[,]" and fails to undermine confidence in Petitioner's conviction. A reasonable jury can accept Mr. McArthur's plot existed, while convicting Petitioner based on the consistent eyewitness testimony presented at trial.

Although Mr. Kopera's fraudulent credentials constitute newly discovered evidence under *Hunt v. State*, that holding does not extend to expert opinions acquired after trial, such as Mr. Conrad's opinion. 474 Md. at 110, 252 A.3d at 959 ("This is (hopefully) a unique class of cases."). Mr. Kopera's presence as the State's expert witness did not preclude defense counsel from hiring his own expert to analyze the bullet fragments and testify at trial. Additionally, Mr. Conrad's opinion does not "put the whole case in such a different light as to undermine confidence in the verdict[]" because it provides the same inconclusive testimony that Mr. Kopera presented at trial. *Strickler*, 527 U.S. at 290, 119 S. Ct. at 1952.

Mr. Epps's open warrants did not constitute newly discovered evidence because trial counsel had an opportunity to uncover them through a background check in time to file for a new trial under Md. Rule 4-331. Regardless, Mr. Epps's open warrants carry little impeachment value because Mr. Epps was likely unaware of them and, thus, not likely motivated to lie in exchange for leniency from the State.

31

Assuming, *arguendo*, the above evidence constitutes newly discovered evidence, the evidence cumulatively shows Mr. McArthur, an imprisoned individual, wished to kill Mr. Green. The new evidence also shows the same inconclusive expert testimony, which the jury already heard at trial. It further shows Mr. Epps testified while he had unserved warrants. Taken together, Petitioner's evidence does not undermine a verdict based on consistent testimony regarding the shooting and individuals present at the scene on March 14, 1989.

For the foregoing reasons, this Court affirms the judgment of the Appellate Court of Maryland.

**JUDGMENT OF THE APPELLATE COURT IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

IN THE SUPREME COURT

OF MARYLAND*

No. 14

September Term, 2022

_____

STEVEN G. CARVER

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,



JJ.
_____

Dissenting Opinion by Gould, J.
_____

Filed: December 20, 2022


* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

I respectfully dissent. Although the Majority correctly answers the first question presented and confirms that the "significance and relevance of the newly discovered evidence must be examined in light of its cumulative effect on evidence available at the time of trial," Maj. slip. op. at 17, it incorrectly applies this standard in practice. The fundamental mistake the Majority makes is that it holds constant the trial that occurred— that is, the Majority assumes the evidence would have unfolded exactly as it did—without considering the ripple effect the additional evidence would have had on the trial court's evidentiary rulings, the State's case, the testifying detectives' credibility, and defense counsel's ability to put on a defense.

As I explain below, the additional evidence would have changed the complexion of the trial. As a result, we should have little confidence in the guilty verdict, as it was premised entirely on inconsistent eyewitness testimony, the very type of evidence this Court has deemed unreliable, and the jury decided the case without the benefit of exculpatory evidence. Accordingly, for the following reasons, I would reverse the judgment of the Appellate Court of Maryland[1] and grant Mr. Carver a new trial.

I will proceed in the following sequence. *First*, I will identify the information that Mr. Carver's counsel had at the time of trial. *Second*, I will describe the new evidence identified by Mr. Carver in his petition for writ of innocence (the "innocence petition"). *Third*, I will identify critical junctures in the trial proceedings where defense counsel was

---

[1] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

stymied and explain how the newly discovered evidence, reasonably considered, could have altered the course of the trial. And *finally*, I will discuss the relevant legal principles and explain how, in my view, the Majority mistakenly applies the law.

**INFORMATION AVAILABLE TO
DEFENSE COUNSEL AT THE TIME OF TRIAL**

The information provided to Mr. Carver's counsel came primarily from two sources: (1) the motion for protective order that the State filed to shield from the defense (and the public) the identity of the State's witnesses; and (2) the police report from the January 1989 shooting of John Green.

*Protective Order*

After Mr. Carver was charged, but before he was taken into custody, the State moved for a protective order to allow it to "withhold the names and addresses of the civilian witnesses" and prevent the Clerk of the Court from divulging such information. In that motion, the State described the connection between the homicides of Damen Barrett,[2] Kenneth Alston, and John Green, and Bryant McArthur's assumed complicity in all three murders. Specifically, the State laid out the following allegations:

- On September 28, 1988, McArthur shot and killed Barrett on the 4000 block of Old York Road.
- On October 6, 1988, McArthur and Terry Antoine Green (no relation to John Green) shot and killed Alston on the 500 block of Rosehill Terrace. McArthur and Terry Green were driven in a "white Ford."
- Alston witnessed McArthur shoot and kill Barrett.

---

[2] Damen Barrett is referred to elsewhere in the record as "Damon." The State does not dispute that references to "Damon" are meant to refer Damen Barrett.

2

- On March 15, 1989,[3] Mr. Carver and Joe Ray Hodge, a.k.a. Tony Ben, shot and killed John Green on the 4000 block of Old York Road.
- The March 15 killing of Mr. Green was "the third slaying in the area of the 4000 block of Old York Road since September 28, 1988."
- Mr. Green witnessed McArthur shoot and kill Barrett and testified about the shooting to a grand jury.
- Mr. Carver was in the Baltimore City Jail from October 25-28, 1988, February 8-14, 1989, and February 27-March 9, 1989, "when he was bailed out on handgun and assault charges."
- McArthur had been in Baltimore City Jail since February 29, 1989. There, he told another inmate "that he knew John Green was to testify against him and that he had someone to take care of John Green."

Citing "the strong interest of the State of Maryland[] in the non-disclosure of the identity of the witnesses" in Mr. Carver's case, the State requested a protective order to "allow[] the State to lawfully withhold such information from the defense," to require the Clerk of the Court to delete any mention of the names or addresses of any witnesses, and to preclude the Clerk from divulging any such information. The circuit court granted this motion.

From the allegations in the State's motion, defense counsel had reason to believe the State had evidence that: (1) the three murders—Barrett, Alston, and Mr. Green—were connected; and (2) Alston and Mr. Green were killed to eliminate witnesses who might testify against McArthur at his trial for Barrett's murder. Further, by inference, defense counsel could have reasonably assumed that the State had reason to believe that Mr. Carver

---

[3] The State was off by one day: Mr. Green was killed on March 14, 1989.

was the "someone" whom McArthur—according to another inmate—had identified to "take care of John Green."[4]

Of course, the motion for protective order did not identify any evidence in support of the State's allegations. That was the point of the motion: to shield the identities of the witnesses who could tie the three murders together.

### *The Police Record of the January Shooting*

At trial, Mr. Carver was represented by attorney Gary Ticknor. At that time, in addition to the protective order, Mr. Ticknor had seen the police reports from the January 1989 shooting of Mr. Green. One such report was a handwritten document stating:

> During the summer after 2 deaths of his friends, John Green was told that he would be the next one killed. This threat was made by Bryant McArthur who is still wanted in reference to the other 2 homicides. John Green was seen shortly after the warning by Officer Day and myself, wearing a bulletproof vest. He was also arrested for carrying a gun, supposedly to protect himself from Bryant McArthur. All of these events occurred just recently.

---

[4] Presumably, the witness who told the State that he heard McArthur say "that he knew John Green was to testify against him and that he had someone to take care of John Green" was Melvin Jackson. As the Majority notes, a police report reflecting Jackson's account of McArthur's statement was another newly discovered piece of evidence. The circuit court viewed this evidence as inculpatory; so too does the Majority. *See* Maj. slip op. at 7 n.8, and at 21 n.12. I have a different perspective of that evidence. If we are to assume that the defense is now in possession of all relevant information, then it appears Jackson was the only person known to the State who could have potentially tied Mr. Carver to McArthur. By not calling Jackson at trial (and not turning over the document), it is reasonable to infer that the State did not find him or his account to be credible, leaving it with no evidence to connect Mr. Carver to McArthur. That could explain why the State acknowledged to the jury in its closing argument that it had no evidence of a motive for Mr. Carver to kill Mr. Green at the behest of McArthur and fought to prevent defense counsel from attempting to connect the three homicides and McArthur's complicity therewith.

4

Mr. Ticknor also knew that Mr. Green was well acquainted with Mr. Carver and that Mr. Green's reported description of his January shooter did not match Mr. Carver. Mr. Ticknor testified at the hearing that although he knew that Mr. Green was afraid of McArthur, he lacked the details of the threats that were reflected in the March 15, 1989 memorandum from Detectives Richard L. James and David John Brown, described below.

The information available to defense counsel was of limited value to Mr. Carver. Mr. Green, of course, was deceased, so defense counsel did not have a witness who could testify—for the purpose of establishing the truth—to the substance of Mr. Green's report of the January shooting. And, when defense counsel attempted to use that police report for the more modest purpose of establishing that Mr. Green did not identify or describe Mr. Carver as the shooter, he was shut down by the trial court. As explained below, that's why the new evidence would have been so critical: it would have given defense counsel admissible evidence to establish that the murders of Barrett, Alston, and Mr. Green were connected and that McArthur had a motive to kill Mr. Green and solicited someone to assist him less than two weeks before Mr. Green was killed. In addition, the new evidence tended to show that Mr. Carver had no connection to McArthur and not only had no motive to help him, but had good reason *not* to help him.

**THE NEW EVIDENCE**

Mr. Carver's new evidence at the hearing in the circuit court falls within two categories: (1) McArthur's motive to kill Mr. Green; and (2) the missing evidentiary connection between McArthur and Mr. Carver.[5]

### *Category No. 1: McArthur's Motive to Kill Mr. Green*

1.  The Denise Brewer Evidence

    a.  Petitioner's Exhibit B, page 32.  This document is a Baltimore Police Department ("BPD") memorandum from Detective David John Brown to Captain John J. MacGillivary, Commanding Officer, Crimes Against Person Section.  The subject line of the memorandum identifies the "homicide/shooting" of Mr. Green dated "14 Mar. 1989" at the 4000 block of Old York Road.  The memorandum states:

        > Ms.[ ]Brewer had been assaulted on 10 April in the 600 blk.[ ]McCabe Ave.  "Darryl" had stuck her in the face with a handgun and fired four shots at her.  This was reported to police under CC#5D-19087.  Ms. Brewer was interviewed at the Homicide Office, stating that "Darryl" was involved in Bryant McArthur[']s Gang, and Darryl approached her in early March, saying that "Big John" was running his mouth, and Darryl wanted Denise to set him up, getting him to walk down Rosehill Terr. so they could "get him".  Ms. Brewer declined.  Det. Edgerton continues the investigation into area homicides.

    b.  Petitioner's Exhibit B, pages 33-38.  This document is the BPD report of the April 10 assault of Denise Brewer.  The officer who interviewed Brewer and wrote the report understood Brewer to have said that she was attacked by two individuals: "Darnell" of 600 McCabe Avenue and "Ernestine."  The report reflects that Brewer identified her friend Antoine as a witness to the attack, that "Darnell" hit her with the butt of gun, knocking her to the ground, that Ernestine started beating her while she was on the ground, and that after she got back on her feet and ran away, Darryl fired four shots at her, each of which missed.  Brewer reported that Darnell was driving a burgundy Nissan

---

[5] I am less persuaded by Mr. Carver's focus on the evidence of Joseph Kopera's fraud and the arrest warrants for Hodges Epps.

Maxima and provided the license plate number. Brewer also reported that she knew why "Darnell" tried to shoot her: "Because she [Brewer] knew that he had shot and killed a man named Damin [Barrett] on Old York Rd." The report states that the Nissan identified by Brewer was registered to a person named Samantha and that attempts by the report's author to locate this person were unsuccessful.[6]

c.  Handwritten police note. The note is undated, but it refers to the April 10 assault on Brewer. It also states "Rose Hill Terr. (walking down)[,]" followed by "'Big John,' running his mouth, was supposed to testify against." It appears that this handwritten note reflects the same information contained in Detective Brown's memorandum described above.

d.  Another handwritten police note. Also undated, this note states that "Darnell" was Terry Green's alibi witness and was the driver of the car (presumably carrying McArthur and Terry Green when Barrett was killed), "a white Hyundai (his car), not a white Ford," which was traded in for a "Burgundy Maxima."

e.  Note regarding telephone call between Brewer and ASA Sarah Reeder. This note was discovered by Mr. Carver's innocence counsel in 2017, who was not permitted to keep a copy. At the innocence hearing, the court accepted defense counsel's proffer that the note reflected that Ms. Reeder had spoken with Brewer in 1989, that Brewer disclosed Darnell Armstead's last name and phone number, and that she knew that Armstead had been the driver when McArthur murdered Alston.

f.  Discovery that Brewer's attacker was Armstead. Mr. Carver's innocence counsel located "Darnell" and learned that his last name was Armstead. The State did not dispute this connection or that Armstead was the driver of the car when McArthur and Terry Green killed Alston.

Presumably, if she had been called at trial, Brewer's testimony would have been consistent with the documents described above.

2.  Police note dated March 15, 15:15 hrs. This note appears to reflect the following information provided to the police by Barrett's sister, identified as "Ms.

---

[6] It does not appear to be disputed that Darryl and Darnell are the same person.

7

Davenport": "Bryant calls on phone on Old York near Rosehill"; "Gives messages to people on street to relay to other people"; "By time of trial there will be no witnesses"; "Say no witnesses." In other words, McArthur was putting the word out that any witness against him would be killed.

Presumably, Barrett's sister would have been available at trial to testify about the call described in this note.

3. <u>Memorandum dated March 15, 1989, from Detective Richard L. James and Detective David John Brown (Homicide Unit) to Captain John J. MacGillivary (Commanding Officer, Crimes Against Person Section)</u>. The subject line of this memorandum refers to the homicide shooting of John Wesley Green on March 14. Referring to the January 1989 shooting of Mr. Green, the memorandum states:

> Officer Plater stated that he talked to the victim after his release from the hospital. John Greene stated to the Officer that he was approached by Bryant McArthur who told him that he was "going to take him out." McArthur also called the victims house and stated that he would "bust him in the ass" the first chance he got. It was soon after this interview by Officer Plater that the Officer observed Greene wearing a bullet proof vest.

*Category No. 2: Absence of Motive for*
*Mr. Carver to Conspire with McArthur to Kill Mr. Green*

Rodney Webb testified at Mr. Carver's innocence hearing. Webb was a second cousin to Alston, who had witnessed McArthur's murder of Barrett and was allegedly murdered by McArthur. Webb was a friend of Mr. Carver. Both Mr. Carver and Alston spent a lot of time at Webb's house. Webb testified that Mr. Carver and Alston were close friends and referred to each other as cousins. He further testified that there was a rivalry between groups associated with Old York Road and McCabe Avenue. Webb was

8

associated with the Cator Avenue group, which, in turn, was associated with the Old York Road group. Mr. Carver was associated with Old York and Cator. McArthur had lived on McCabe Avenue. Mr. Carver's co-defendant, Hodge, also lived on McCabe. This evidence, if believed, would show that Mr. Carver would not have wanted to help McArthur—a member of a rival group—get away with killing Alston.

### PUTTING THE NEW EVIDENCE IN CONTEXT: A LOOK AT THE TRIAL

Hodge and Mr. Carver were both charged with Mr. Green's murder under separate case captions, but the cases were consolidated for trial. On November 6, before the jury selection started, the parties presented several preliminary motions, including a motion by both defendants to suppress identification by Hodges Epps, Arlin Doles, and Carmelita McIntosh. The statements made by the parties and the trial judge are important to this analysis in two respects.

*First*, the discussion between counsel and the court reveals that the trial judge continued to assume that the allegations contained in the State's motion for protective order were well-grounded and that Mr. Carver was somehow connected to McArthur's conspiracy to eliminate witnesses. This is important because it informed the trial judge's perspective of the alternate perpetrator defense Mr. Carver was trying to mount. That is, if Mr. Carver was doing McArthur's bidding when he shot and killed Mr. Green, as the State apparently still believed, McArthur's involvement was irrelevant to Mr. Carver's guilt or innocence. Seen in that light, one can understand why the trial judge would put

9

Mr. Ticknor on a short leash when he tried to lay the groundwork for the alternate perpetrator defense.

The trial judge's belief in the continuing need for the protective order is reflected in several of his statements. At one point, when the State mentioned the name of a witness subject to the protective order, the court questioned why the State revealed the name and later said to Mr. Carver's counsel, "Well, that witness is no longer under the protective order because the State has stated her name in open court, and I hope that she remains alive so that anybody who want[s] her for trial can have her."

At another juncture, when attorneys for Mr. Carver and Hodge complained to the trial judge that they were still prohibited from disclosing the names of the State's witnesses to their respective clients and that the protective order was impacting their ability to prepare a defense, the judge said, "Any witness wind up dead, or potential witness, somebody is going to have a big problem." And in response to Hodge's attorney's request for disclosure of the names of the State's witnesses for the motion to suppress hearing that was to about to commence, the court responded: "No, you can't. I want the witness living. I assume you do too. Let's go."

Another indication of the trial judge's continued belief in the State's motion for protective order was when the State moved to preclude defense counsel from informing the jury that the identities of the State's witnesses were withheld until shortly before trial. The trial judge responded that if defense counsel were to do that, "you [the prosecutor] can tell [the jury] the reason for it was a protective order and you are afraid defendant is going to kill them." In other words, the trial judge continued to believe that Mr. Carver posed a

10

threat to any witness who could implicate McArthur. Notably, the State did not disabuse the trial court of that notion, even though, except for the documents and information newly discovered, the State had no admissible evidence connecting Mr. Carver to McArthur.

*Second*, although Mr. Ticknor had information about the January shooting of Mr. Green and of McArthur's threat and motive to kill Mr. Green, the preliminary motions discussion reveals the limited way in which Mr. Ticknor could have reasonably expected or hoped to use such information to benefit Mr. Carver. In that regard, the State moved to preclude "mention of a conspiracy order by one Bryant McArthur." The prosecutor represented to the trial court: "I have no admissible evidence to that at trial." Mr. Ticknor proffered a theory consistent with the limited information he then had available: "Now, [Mr. Green] had known Mr. Carver a long time. All I'm saying is he was shot by somebody other than my client shortly before he was killed. I think I should be allowed to bring that out for a defense." The court denied the State's motion, but that victory for the defense was short-lived.

The State also moved to preclude mention of the January shooting of Mr. Green, stating: "Your Honor, on my examination of the offense report of [the January shooting], [Mr. Green] gave a description of his assailant. He knew Bryant McArthur at the time. He did not offer the name of Bryant McCarthy [sic], so for counsel to suggest that it was Bryant McArthur, is I believe to be speculating." The court suggested that if defense counsel tried to suggest McArthur was the January shooter, then the State could, in response, "whip out the report, get the officer who took the report[,]" and show that the description of McArthur did not match the description given by Mr. Green of his shooter.

11

At that point, Mr. Ticknor proffered a less ambitious use of the evidence pertaining to the January shooting: "But if it's limited to the fact John Green was shot, gave a description, but that he knew Steven Carver and did not say it was Steven Carver, then we don't have Bryant McCarthy [sic] in the case at all." In other words, Mr. Ticknor was trying to show that because Mr. Green knew Mr. Carver, one could reasonably conclude that had Mr. Carver been the shooter, Mr. Green would have identified Mr. Carver as such or given a description that matched Mr. Carver. Thus, Mr. Ticknor's argument went, because Mr. Green did not identify Mr. Carver, one could conclude that Mr. Carver was not the shooter.

Mr. Ticknor had good reason to tread carefully. Everything defense counsel knew about the homicides of Barrett, Alston, and Mr. Green, as well as the January shooting of Mr. Green, came from the allegations in the motion for protective order and Mr. Green's account of the January incident as reflected in the police reports, which, under the hearsay rule, could not have been used to establish the truth of Mr. Green's reported account. Thus, as far as Mr. Ticknor and the trial judge were aware, Mr. Green—the victim—was the only person who could have tied the three homicides together, described the January shooter, and revealed McArthur's phone call and threat to him. Thus, standing alone, the information then available about the January shooting was of limited use to Mr. Ticknor and, as will be seen, even that limited use was deemed irrelevant by the trial judge at trial.

The State, on the other hand, knew from witnesses with first-hand knowledge that: (1) in the two weeks before Mr. Green was murdered, Armstead unsuccessfully solicited Brewer, on McArthur's behalf, to lead Mr. Green into an ambush near the same location

12

where he was ultimately killed; (2) Brewer was solicited because Mr. Green was "running his mouth" that McArthur killed Barrett; (3) the day after Mr. Green was shot and killed, McArthur made an ominous call to a pay phone at Old York Road, near the scene of Mr. Green's murder, to make it widely known that there would be no witnesses to testify that he killed Barrett; (4) less than a month after Mr. Green was killed, Brewer was assaulted and shot at by Armstead, who had driven the get-away car for McArthur and Terry Green when they shot and killed Alston; and (5) Armstead tried to kill Brewer because she knew that McArthur had killed Barrett. Such evidence does not, as the Majority holds, rest on speculation and conjecture.

Once trial started, it did not take long for Mr. Ticknor to learn that, as it related to the January shooting, the court was putting him on a short leash. The State's first witness was Officer Clyde Day, who provided no testimony linking Mr. Carver to the crime. On cross-examination, Mr. Ticknor tried to elicit evidence about the January shooting of Mr. Green, but he quickly ran into a buzzsaw. Mr. Ticknor established that Officer Day had known Mr. Green for about a year and a half and that Mr. Green had been shot through the neck in January. But when Mr. Ticknor asked Officer Day if Mr. Green had provided a description of the shooter—which called for only a "yes" or "no" answer—the trial court sustained the State's relevance objection. When asked by the court where he was going with that line of inquiry, Mr. Ticknor explained that he merely wanted to "show that [Mr. Green] gave a description, but he did not indicate that he knew the person; description does not match the facts, i.e. it was not Steven Carver that shot him." The prosecutor countered: "Your Honor, I don't see how a shooting in January relates to a shooting in March unless

13

counsel is trying to suggest it was the same man that was after him, and we don't have any evidence to that. We have absolutely none." The court sustained the objection because Mr. Green's description of the January shooter was hearsay, stating it "lacks reliability because it can't be cross-examined." Later, the court further explained that the evidence concerning the January shooting was irrelevant unless another person, not Mr. Carver, shot Mr. Green in *both* January *and* March.

It warrants noting at this point that whether the trial court erred in its evidentiary ruling is beside the point.[7] When we assess the impact that the new evidence would have had at trial, we should remain mindful that Mr. Ticknor was given no latitude to connect the string of shootings and that any such connections would have had to be firmly grounded in *admissible* evidence, not speculation. I return to this point later.

The State called Detective Richard James on November 9. Recall that Detective James co-authored a memorandum *one day* after Mr. Green was killed, which was not provided to the defense, in which he wrote:

> Officer Plater stated that he talked to the victim after his release from the hospital. John Greene stated to the Officer that he was approached by Bryant McArthur who told him that he was "going to take him out." McArthur also called the victims house and stated that he would "bust him in the ass" the

---

[7] In my view, the trial court did err. Whether Mr. Green offered a description of the January shooter is a "yes" or "no" question that would not have revealed an out-of-court statement offered for its truth. Similarly, if the officer had limited his testimony to the fact that Mr. Green did *not* identify Mr. Carver as the shooter and did *not* offer a description of the shooter who resembled Mr. Carver, that too would not have been evidence of an out-of-court statement offered for its truth. In other words, the fact that the investigating officer heard Mr. Green offer a description that did not match that of Mr. Carver would have independent relevance tending to show, to any investigator determined to uncover the truth, that Mr. Carver may not have been the January shooter. *See Holmes v. South Carolina*, 547 U.S. 319, 327 (2006).

first chance he got. It was soon after this interview by Officer Plater that the Officer observed Greene wearing a bullet proof vest.

In sum, this memorandum recounts statements made by Mr. Green to Officer Plater about the January shooting, who, in turn, shared them in some fashion with Detective James. Thus, even though Mr. Ticknor could not prove, through the testimony of either Officer Plater or Detective James, the truth of the information provided by Mr. Green to Officer Plater, this memorandum definitively reflects that Detective James had *a basis* to believe that McArthur was involved in both the January and March shootings of Mr. Green. It also shows that Detective James had *a basis* to consider the possibility of other suspects in the murder of Mr. Green. With that in mind, let's turn to Detective James's testimony.

When Mr. Ticknor cross-examined Detective James on November 9, the court sustained the State's objection when Mr. Ticknor asked: "Did you investigate to see if the person who shot him in January 1989 is the person who shot him in March of 1989?" Mr. Ticknor tried to come back to that point when his cross-examination resumed on November 13. Mr. Ticknor first elicited a confirmation from Detective James that he was the "supervising detective in this case" and that he had "all the reports, all the information before [him] in that file" at the time of his testimony. Mr. Ticknor then asked Detective James if he had investigated any suspects other than Mr. Carver and Hodge. Detective James responded that he "had no reason to" because he "had a positive identification that evening" of Mr. Carver.

Consider how the new evidence would have likely impacted Detective James's testimony. As discussed above, in connection with the investigation into the *March*

15

homicide, Detective James wrote a memorandum about the *January* shooting. Clearly, the detective believed the two incidents were connected, and, had the court been made aware of that, it is reasonable to assume that the court would have seen the relevance of the January shooting and allowed Mr. Ticknor some latitude to explore the thoroughness of the investigation into a possible connection. Without that information, Mr. Ticknor was stymied.[8]

Assuming Detective James was the supervising detective in Mr. Carver's case as he testified, he undoubtedly would have been aware of his own memorandum as well as the other newly discovered documents discussed above. That means that, when he testified, Detective James had to have known about Brewer. Detective James had to have assumed that Brewer would have testified that she had been solicited by Armstead, on McArthur's behalf, to facilitate a hit on Mr. Green less than two weeks before his murder. Detective James also had to have known that, on the day after Mr. Green's murder, McArthur made a call to a telephone on Old York Road to put the word out that there would be no witnesses to testify against him. And he had to have known that Brewer was assaulted and nearly killed on April 10 by Armstead for having knowledge of McArthur's complicity in the murders of Barrett and Alston. Thus, in assessing how the new evidence would have impacted the trial, it seems obvious that, at a minimum, the undisclosed memorandum

---

[8] The circuit court held that defense counsel knew McArthur "wanted the victim dead" and therefore "could have pursued this 'McArthur' strategy if he wished." In my view, this was clearly erroneous. The circuit court did not explain how, under any realistic assessment of what actually transpired at trial, Mr. Ticknor could have made any headway on that theory without the new evidence. He had no admissible evidence to support the theory, and Detective James flat-out denied any basis to suspect anyone else.

16

authored by Detective James and the other newly discovered documents would have provided ammunition for Mr. Ticknor to have impeached the detective's credibility and demonstrated that the investigation into the crime was myopic and not sufficiently thorough.

More importantly, it seems less obvious, but is nonetheless probably true, that had the documents been disclosed, Detective James would likely not have testified as he did. That is, had Detective James known that defense counsel was armed with the contents of his file, Detective James would have had to acknowledge a basis for considering other suspects and would never have opened himself up to such impeachment.

Indeed, had the documents been disclosed, the State would have had to assume that Brewer and Barrett's sister would testify about: (1) the solicitation of Brewer to assist in the execution of Mr. Green in early March, less than two weeks before he was murdered; (2) the ominous call the day after Mr. Green was killed to put the word out that there would be no witnesses;[9] and (3) the attempt made on Brewer's life on McArthur's behalf. These events, and the details that these witnesses would have provided about these events, would have tied together the murders of Barrett, Alston, and Mr. Green, and would have connected all three murders to McArthur. All of that evidence pointed to why Mr. Green was murdered in broad daylight on a busy street: to intimidate anybody who would dare bear witness against McArthur. Such evidence would have provided a cogent alternate

_____

[9] The circuit court made no mention of this call, let alone its import.

17

perpetrator defense based not on speculation (as the Majority incorrectly concludes), but facts. *See Holmes*, 547 U.S. at 327.

Thus, if the defense had had the newly discovered evidence, as a matter of trial strategy, the State would have been forced to grapple with the issue of Mr. Carver's connection to McArthur, or lack thereof, as well as the issue of Mr. Carver's motive, or lack thereof. In other words, the State would have had to assume that once the jury understood the connection between the three murders, the unsuccessful attempt to kill Mr. Green, and McArthur's actions to eliminate witnesses, the jury would have expected the State to show why Mr. Carver would help McArthur by murdering Mr. Green in broad daylight. And the absence of such evidence could certainly have been enough to create reasonable doubt.

That's where Mr. Carver's close relationship with Alston would have come into play. That evidence could have persuaded one or more jurors that Mr. Carver would never have joined a conspiracy to help McArthur get away with Alston's murder. So too the evidence that Mr. Carver and McArthur were associated with rival groups. Thus, when paired with the evidence that Mr. Carver would have had no motive to help McArthur eliminate witnesses to the Barrett murder, the undisclosed documents and related testimony undeniably tends to exculpate Mr. Carver.[10]

---

[10] Quoting *Jones v. State*, 310 Md. 569, 586-87 (1987), the circuit court viewed the newly discovered evidence as merely showing that another person may have paid Mr. Carver to kill Mr. Green, saying it was "hardly exculpatory." This view reflects an error of law, as reflected in the Majority's answer to the first question. That is, the circuit court took a myopic view of the newly discovered evidence and failed to consider how that

18

**APPLYING THE CORRECT STANDARD**

As an initial matter, the Majority correctly describes the legal standard under which we review actual innocence claims. Newly discovered evidence must, among other things, raise a "substantial or significant possibility" that, had the jury received such evidence, its verdict would have been different. Maj. slip op. at 16. A "substantial or significant possibility" is less stringent—i.e., a lower bar—than "probable." Maj. slip op. at 15-16.

The materiality analysis is "identical" to materiality claims under *Brady v. Maryland*, 373 U.S. 83 (1963), and ineffective assistance of counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984): whether the newly discovered evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The materiality of the newly discovered evidence must be examined in light of its cumulative effect "within the context of the entire adversarial proceeding." Maj. slip op. at 18 (citing *Faulkner v. State*, 468 Md. 418, 469 n.24 (2020)). Accordingly, **"**newly discovered evidence can logically and reasonably lead to other evidence, not necessarily new, which would then take on new dimensions and importance." Maj. slip op. at 18 (citing *Faulkner*, 468 Md. at 469 n.24). On these basic points, the Majority gets it right.

The Majority goes astray applying these principles and, in doing so, unwittingly raises the bar for petitioners such as Mr. Carver. The Supreme Court, in *Kyles v. Whitley*,

---

evidence would have interacted with the other evidence that would have been available and relevant in light of the new evidence—that Mr. Carver would not have taken sides with McArthur and helped him get away with killing Alston, whom Mr. Carver considered a "cousin."

made clear that a petitioner need not show by a preponderance of the evidence that the availability of the suppressed (or, here, newly discovered) evidence would have resulted in an acquittal, either by creating reasonable doubt or by providing an explanation for the crime that does not inculpate the petitioner. 514 U.S. at 434. Put differently, a petitioner is not required to show that the newly discovered evidence *proves* his innocence.

In *Bloodsworth v. State*, 307 Md. 164 (1986), which involved a *Brady* claim, even though undisclosed evidence of an alternate perpetrator did not prove the petitioner was innocent, we nonetheless held that it undermined confidence in the verdict and therefore, ordered a new trial. Bloodsworth was convicted of raping and murdering a young girl. *Id.* at 166-67. Two boys saw Bloodsworth walk off into the woods with the victim, and a nearby resident saw the victim with the petitioner around the time of the murder. *Id.* at 167-68. When interviewed by police later, Bloodsworth referenced a bloody rock found at the crime scene that was not known to the public. *Id.* at 169. One witness said Bloodsworth mentioned the girl, the girl's clothes, and the bloody rock. *Id.* at 169-70. Another witness said Bloodsworth told her that he did something bad, was afraid his wife would not take him back, and hoped to be admitted to the state hospital. *Id.* at 170.

In discovery, the prosecution provided limited information concerning another man named Gray. *Id.* at 171. Gray was discovered wandering in the woods near the crime shortly before the body was found, carrying a billy club. *Id.* He also directed the victim's father to her underwear, which was hanging by a tree branch in the woods. *Id.* Police found another pair of women's underwear in Gray's car. *Id.*

20

The State failed to disclose a detective's confidential report suggesting that Gray was withholding information from police and contending that he therefore should not be overlooked as a suspect. *Id.* at 172. At the petitioner's hearing for a new trial, the police detective—who had discovered the victim's body—testified that he had found Gray in the woods very dirty, except for his clean hands and a blood-like spot on his shirt. *Id.* at 173. Gray appeared nervous and vomited when police searched his car. *Id.* The underwear found in Gray's car was that of a small girl, and Gray exhibited detailed knowledge of the victim's possessions. *Id.* Gray had a prior conviction for indecent exposure and also failed a polygraph examination in connection with the case. *Id.*

Importantly, the undisclosed evidence pointing to Gray did not prove Bloodsworth was innocent: it neither contradicted any of the evidence of Bloodsworth's culpability nor ruled out the possibility that Bloodsworth and Gray acted in concert.[11] Nonetheless, we deemed the undisclosed evidence material. *Id.* at 175-76. Under the Majority's approach today, however, Bloodsworth would not have been awarded a new trial because the undisclosed evidence of an alternate perpetrator did not, using the Majority's formulation, "undermine the factual basis of the conviction," Maj. slip op. at 31, by disproving the allegedly incriminating facts.

The Majority contrasts this case with *Faulkner* but overstates its significance. Maj. slip op. at 21-23. In *Faulkner*, petitioners Faulkner and Smith had been convicted of murder and burglary. 468 Md. at 426. Newly discovered evidence that handprints on the

---

[11] Indeed, one of Bloodsworth's statements suggested that he had some type of encounter with or relationship to Gray. *Bloodsworth*, 307 Md. at 169-70.

open window of the victim's home belonged to a man named Brooks, and that another man named Thomas had confessed to committing the crime with Brooks, presented "compelling" evidence of an alternate perpetrator. *Id.* at 467-69.

Though the alternate perpetrator evidence in *Faulkner* was "compelling"—admittedly even more so than the newly discovered evidence here—we never said such evidence must prove a petitioner's innocence. *Id.* at 468-69. To the contrary, we expressly rejected requiring a petitioner to prove the existence of an alternate perpetrator. *Id.* at 467 (acknowledging that "the circuit court applied an erroneous standard" by requiring the petitioner to prove "beyond a reasonable doubt that [the alternate perpetrators] committed the crimes").

The Majority also erred in requiring Carver show that the newly discovered evidence rendered the State's evidence insufficient to convict him.[12] Maj. slip. op. at 23-24 ("A reasonable jury could believe the following two facts and still convict Petitioner: (1) Mr. McArthur plotted Mr. Green's death; and (2) Petitioner and Mr. Hodge happened to kill Mr. Green first."); and 31 ("A reasonable jury can accept Mr. McArthur's plot existed, while convicting Petitioner based on the consistent eyewitness testimony presented at trial."). To be sure, even with the new evidence, there may have been enough evidence to convict Mr. Carver based on the eyewitness testimony of McIntosh, Epps, and Doles.

But that's beside the point. In *Kyles*, the Supreme Court held that a petitioner is *not* required to show that the newly discovered evidence "would have left the State with too

---

[12] The circuit court also improperly demanded the same of Carver. ("[T]he evidence against the Petitioner was very substantial.").

little inculpatory evidence to convict." *Ware v. State*, 348 Md. 19, 47 (1997) (citing *Kyles*, 514 U.S. at 434-35). The new evidence need only put the case in a "different light" for the jury. *Kyles*, 514 U.S. at 435.

Our decision in *Ware v. State* is instructive. There, we held that evidence that a State's witness hoped to be rewarded for his testimony with a modified sentence was material, notwithstanding the "overwhelming" evidence against the petitioner. 384 Md. at 35, 54.

Ware was convicted of fatally shooting his fiancée Gentry and non-fatally shooting her friend Allen at Gentry's house. *Id.* at 25. Anderson, who was incarcerated, testified that he was on the phone with Allen—who was at Gentry's home—at the time of the shootings. *Id.* at 26-27. According to Anderson, Allen said Ware and Gentry had been fighting, and when Allen set the phone down to check on Gentry, Anderson heard two gunshots, a pause, and a third gunshot. *Id.* The State successfully used the pause between gunshots to prove Ware killed with premeditation. *Id.* at 52. Though other witnesses could testify that they saw Ware in the Gentry home around the time of the shootings, Anderson was the only sensory witness and the only one whose testimony identified Ware as the shooter. *Id.*

After Ware's conviction, defense counsel learned that the State had failed to disclose Anderson's efforts to secure a sentence modification for testifying against Ware. *Id.* at 34-35. Moreover, the State had withheld transcription of the hearing on Anderson's motion for reconsideration where he had testified to hearing only two—not three—gunshots. *Id.* at 49. We held that the suppressed evidence was sufficiently material to undermine the

23

verdict, reasoning that the jury may have otherwise partially or entirely discredited Anderson's testimony and found Ware not guilty or guilty of a lesser crime. *Id.* at 52-53.

In *Ware,* like here, the State lacked conclusive forensic evidence linking the defendant to the crime and thus relied on witness testimony placing Ware at the scene. The evidence against Ware, however, was arguably stronger than that against Mr. Carver: multiple witnesses said Ware and Gentry had been fighting and that Gentry seemed scared shortly before the shootings, *id.* at 25-26; Gentry's brother said that, a few hours before the shootings, Ware had pointed a gun at him after he had beaten and thrown Ware out of the house for mistreating Gentry, *id.*; and other witnesses saw Ware near the Gentry home carrying a long, dark object, *id.* Moreover, unlike Mr. Carver, Ware did not provide *any* evidence suggesting an alternate perpetrator.

The trial court, in denying Ware's motion for a new trial, described the State's evidence as "overwhelming." *Id.* at 35. Yet, despite such strong evidence, we *still* held that the undisclosed evidence of Anderson's deal-making with the State and inconsistent statement at his sentence modification hearing sufficiently undermined our confidence in the verdict to warrant a new trial. *Id.* at 52-55.

In assessing the impact of the new evidence, we should also remain mindful that eyewitness testimony is inherently unreliable. *See Bomas v. State*, 412 Md. 392, 422-23 (2010). In *Bomas*, we highlighted the fact that empirical psychological research has demonstrated the unreliability of eyewitness identification. *Id.* (citing Richard S. Schmechel, Timothy P. O'Toole, Catharine Easterly, and Elizabeth F. Loftus, *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 JURIMETRICS

177, 184 (2006)). Quoting from *United States v. Wade*, we acknowledged that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification," 388 U.S. 218, 228 (1967), and also concluded that "we are sensitive to the perils of such testimony." *Bomas*, 412 Md. at 423. Here, however, sensitivity to the unreliability of eyewitness testimony is not reflected in the Majority's analysis. Clearly, the newly discovered evidence would have put the inherently unreliable eyewitness testimony in a new light.

Here, only one eyewitness (Epps) testified that he saw Mr. Carver shoot Mr. Green. Another eyewitness (Doles) testified that although Mr. Carver was at the shooting, he did not see Mr. Carver shoot Mr. Green. And the third eyewitness (McIntosh) could not only not identify Mr. Carver, but she witnessed the incident while driving with the radio on, lost, and having just swerved to avoid hitting a child crossing the street.

All three eyewitnesses were subjected to vigorous cross-examination that highlighted some inconsistencies with their respective accounts as well as with the coroner's objective findings. If the jury had had the benefit of all of the evidence, we should at least acknowledge the likelihood that jurors could have viewed the eyewitness testimony in a new light.

One final point. Mr. Carver is not advancing a speculative theory here. It was *the State*, in its motion for protective order, that alleged the connection between the three murders and McArthur's complicity in same. Those allegations, backed with no supporting evidence, were accepted by the trial court, and on that basis the State's witnesses were withheld from the defense until days before trial. Thus, far from being speculative, as the

25

Majority holds, the testimony of Brewer and Barrett's sister would have directly *supported* the theory advanced by the State at the inception of this case. Crediting the State with good faith in positing such a theory, surely a jury equipped with the newly discovered evidence would have taken it seriously.

Thus, for the foregoing reasons, I respectfully dissent.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/14a22cn.pdf